**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

|                                        |   |                              |
|----------------------------------------|---|------------------------------|
|                                        | ) |                              |
|                                        | ) |                              |
| In re AMERICA SERVICE GROUP, INC.,     | ) | No. 3:06-0323                |
| et al.,                                | ) | JUDGE HAYNES                 |
|                                        | ) |                              |
|                                        | ) |                              |
|                                        | ) |                              |

**M E M O R A N D U M**

**A.**   **Analysis of the Amended Complaint**

    1.    ASG's Corporate History ................................................................... 2

    2.    ASG's Financial History .................................................................6

    3    SPP's Accounting Practices .............................................................20

    4.    PHS's Medical Practices ................................................................24

    5.    Published Reports about ASG, SPP and PHS ......................................26

    6.    ASG's Internal Investigation ..........................................................28

    7.    GAAP Violations..........................................................................33

    8.    Individual Defendants' Statements and Conduct..................................34

**B.**   **Conclusions of Law**

    1.    Standard of Review.......................................................................44

    2.    Pleading Requirements under Rule 10(b) & PLSRA..............................50

    3.    Plaintiffs' Theories of Liability........................................................52

        a. Defendants' Misrepresentations.............................................54

        b. Defendants' Omissions........................................................67

        c. Defendants' Practices in "Connection with" Sales of ASG stock........70

        d. Fraud on the Market...........................................................75

    4.    Plaintiffs' Scienter Allegations........................................................76

    5.    Plaintiffs' Section 20(a) Claims.......................................................92

    6.    The Dura Injury Requirement..........................................................96

**C.**   **Relief**

    ........................................................................................100

i

Plaintiffs, shareholders of America Service Group Inc. ("ASG"), filed this action under the federal securities laws, 15 U. S. C.§ 78aa, on behalf of themselves and a class of shareholders against the Defendants: ASG; Michael Catalano, ASG's chief executive officer; Michael Taylor ASG's chief financial officer; Secure Pharmacy Plus, LLC ("SPP"), an ASG subsidiary; Enoch E. Hartman, III and Grant Bryson, who were at times relevant to this action, chief executive officers at SPP or ASG. Plaintiffs, owners of ASG stock, assert claims under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, as well as Rule 10(b)(5) of the Securities Exchange Commission's Regulations.

In sum, Plaintiffs allege that from September 2, 2003 through June 23, 2006 when they purchased or held ASG's stock, these Defendants engaged in and/or materially assisted in a scheme and course of business to inflate artificially the value of ASG stock by manipulating the costs and revenues of SPP and Prison Health Services ("PHS") ASG's subsidiaries, as reported in ASG's consolidated financial reports. These practices are alleged to have misled investors about ASG's and its subsidiaries' actual financial performance and condition. This unlawful scheme included false and misleading statements about ASG's ability to control its subsidiaries' costs and to earn profits on ASG's subsidiaries' government contracts to provide medications and medical services to inmates at federal and state prisons as well as at local jails. Plaintiffs also allege that ASG's statements of financial success were based upon revenue and earnings growth that were calculated in violation of Generally Accepted Accounting Principles ("GAAP"). Plaintiffs further allege that the Defendants engaged in a fraud on the market and that Defendants Catalano and Taylor engaged in unusual insider trading after these practices had artificially inflated ASG's stock value.

1

Before the Court is the Defendants' motion to dismiss[1] (Docket Entry No. 68) contending, in essence, that the Plaintiffs' amended complaint is legally insufficient to state the scienter necessary for their securities claims. Plaintiffs contend that Plaintiffs' amended complaint: (1) fails to tie the Defendants to any of the alleged fraudulent business practices and statements or loss of business or restatement of ASG's financial reports; (2) fails to allege scienter as to SPP's alleged "cookie jar" accounting practices; (3) fails to provide sufficient facts that PHS's medical care practices is a scheme that gives rise to a strong inference of scienter; (4) fails to allege sufficient facts that ASG, SPP and the individual Defendants are controlling persons of ASG, SPP or PHS; and (5) fails to plead any actionable loss due to the alleged fraudulent practices and statements. Finally, Defendants assert the statutory safe harbor defense for their forward-looking statements in ASG's published reports and their public statements.

In response, Plaintiffs assert, in essence, that their factual allegations are adequate to state actionable federal securities claims against each of the Defendants and to tie their alleged injuries to the Defendants' violations of federal securities law as well as to establish each Defendant's responsibility for these violations and to state a cognizable injury due to such violations.

## A. Analysis of the Amended Complaint

### 1. ASG' Corporate History

Given the inordinate length of the Plaintiffs' amended complaint,[2] a summary of

---

[1] The Defendants' motion does not challenge the Plaintiffs' claims under §§13(b)(2)(A) and (B) of the Exchange Act for the Defendants' failures to maintain accurate records concerning its inventories, costs and net income and to implement procedures reasonably designed to accomplish that purpose. (Docket Entry No. 60, Amended Complaint at ¶¶ 288 and 289).

[2] An amended complaint supercedes the original complaint. Clark v. Tarrant County, 798 F.2d 736, 740-41 (5th Cir. 1986). Plaintiffs' amended complaint with attachments is one

2

Plaintiffs allegations is that ASG, a publicly traded holding company, was created in1978 to provide medical care to inmates at governmental facilities. (Docket Entry No. 60, Amended Complaint at ¶ 25). ASG conducts that business through its wholly-owned subsidiaries, SPP and Prison Health Services, Inc., ("PHS"). Id. at ¶¶ 17-19). ASG utilized its subsidiaries to provide privately managed healthcare services and medications. SPP provides pharmaceuticals and medical supplies to state and federal prisons as well as local jails and PHS operates and staffs the health clinics at these institutions. Id. at ¶¶ 18 and 19. ASG describes itself as "the leading non-government provider of correctional healthcare and pharmacy services in the United States." Id. ASG's stock met the requirements for listing and active trading on the NASDAQ market, requiring ASG to file periodic public reports with the SEC and NASDAQ. Id. at ¶ 295.

In the 1990s, in a competitive bidding process, ASG acquired fixed fee contracts whose profitability depended upon ASG's ability to estimate and control its future healthcare costs. Prior to and during the Class Period, from September 2, 2003 through June 23, 2006, ASG "assured investors that it could reliably predict such costs." Id. at ¶ 26. ASG informed investors that inmates with severe and catastrophic illnesses could increase its costs, but ASG acquired excess insurance coverage to control its total operating costs. Id.

On September 2, 2000, ASG acquired Stadtlanders Corrections Division of Bergen Brunwing Corporation, SPP's predecessor, to increase ASG's control of its pharmacy and

---

hundred sixty-eight pages (Docket Entry No. 60, Amended Complaint) and is not the model of clarity. In addition, the parties submitted extensive memoranda and supporting documents on the Defendants' motion to dismiss. For these claims, judicial analysis "necessarily involves a sifting of allegations in the complaint. As we have noted, recklessness in securities fraud is an untidy, case-by-case concept." Helwig v. Vencor, Inc., 251 F.3d 540, 551 (6th Cir. 2001) (en banc), abrogated on other grounds by Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 127 S.Ct. 2499, 2510 (2007).

medical supply costs. Id. at ¶ 27. The Defendant Hartman, then Stadtlanders's president and chief executive officer, became SPP's president and chief executive officer and later ASG's executive vice president. Id. at ¶ 28. In 2004, Hartman appointed Defendant Bryson as SPP's chief executive officer when Hartman became PHS's chief operating officer. Id.

At the time of ASG's acquisition of Stadtlander, ASG's costs for drugs and medical supplies represented 16% of ASG's operating costs. Id. at ¶ 27. After the acquisition, SPP's annual revenues were approximately $80 million that led SPP to represent that it was the number one firm in the correctional pharmacy market. Id. at ¶ 28. With this acquisition, Defendant Hartman consolidated the SPP's various local pharmacies into a central dispensing facility in Franklin, Tennessee, over protests from local governments and state pharmacy boards who questioned the legality of dispensing prescriptions from another state. Id. at ¶ 29. Prior to this acquisition, a senior pharmacist at ASG allegedly warned Defendants Catalano and Hartman of problems with this consolidation of drug dispensation, but Catalano and Hartman ignored them. Id. at ¶ 29.

According to Plaintiffs, PHS's hospital administrators prepared site budgets that were based on annual budgets and unidentified higher officials reviewed and forwarded these budgets to ASG's budget committee. Id. at ¶ 312. These site budgets were allegedly "routinely cut," but with the submissions of monthly reports, a site administrator could submit a written justification for additional funds. Id.

The chief officers of ASG, PHS and SPP held regular meetings to discuss methods to reduce their operating costs. Id. at ¶ 310. ASG conducted monthly meetings in Brentwood, Tennessee that Defendants Catalano and Hartman attended with site accounting managers to

4

review performance at each contract site. Id. at ¶ 311. ASG's regional directors participated in these monthly meetings by teleconference. Id. According to Plaintiffs, former ASG employees who regularly participated in these meetings, including those held during the Class Period, report that the details of a site's financial results were reviewed line item by line item, including facility ledgers and any operational issues. Id. Quarterly audit results were discussed at these meetings to ensure that each site remained within its budget. Id. During the meetings, Hartman and Catalano frequently referred to individual site reports that contained detailed information and financial ledgers reflecting the costs of hospitalization, supplies and pharmaceuticals at each site. SPP held its weekly meetings at its Franklin headquarters over which either Hartman or Bryson presided. Id. at ¶ 314. These meetings also reviewed "pharmaceuticals, contract information, client relations, order entry information ... financial results of operations ... outstanding bids, contract renewals and contracts ... at risk of being ... terminated." Id.

Plaintiffs allege that ASG and the individual Defendants manipulated SPP's and PHS's costs during the class period to lead investors to anticipate improved prospects for ASG's future profits. Id. at ¶¶ 34-44. As to the specifics of these manipulations, Plaintiffs allege that during the Class Period, the Defendants misled their investors by artificially reducing their subsidiaries' healthcare costs and inflating ASG's margins, earnings and prospects for continued financial success. Id. at ¶¶ 1, 111-219, 232-292. Plaintiffs allege that SPP employed "cookie jar" accounting in which earnings accrued until they were needed and expense recognition was delayed until expenses could be absorbed to meet expectations for ASG's performance. Id. at ¶¶ 5, 54, 73-78, 220-222, 227-228. According to Plaintiffs, to reduce their subsidiaries' costs, the Defendants also utilized fraudulent accounting and billing practices at SPP that violated SPP's

5

contracts with its customers. In addition, PHS denied inmates access to covered and necessary medical services and expensive medications to reduce its costs in violation of PHS's government contracts. Id. at ¶¶ 45-72.

After published reports of these practices, ASG had to restate five years of its financial reports. In this restatement, ASG acknowledged that SPP had reduced its costs by failing to provide customers with contractually required discounts, rebates, and return credits. See e.g., ¶¶ 3-98, 104-105, 177-183, 220-231, 236-251. Plaintiffs allege that in ASG's restatement of its financial condition, ASG admitted SPP's accounting manipulations, but buried adverse information in ASG's financial statement's footnotes. Id. ASG also acknowledged that PHS reduced its costs by refusing to deliver higher priced medications to inmates; delaying or denying inmates' transfers for expensive off-site treatment facilities, and deliberately understaffing prison health clinics. Id. at ¶¶ 6 and 45-53. With the published reports and restatement of its financial condition, the value of ASG's stock allegedly plunged, giving rise to Plaintiffs' claims that these Defendants' false statements, unlawful scheme and reckless conduct in their financial management of ASG and its subsidiaries caused Plaintiffs' losses.

With this summary, the Court presents Plaintiffs more specific allegations about ASG's financial history, the Defendants' alleged false statements, SPP's accounting practices, PHS's medical services practice, published reports about SPP's and PHS's business practices, Plaintiffs' GAAP claims and the conduct and statements of each Defendant alleged by Plaintiffs for their Section 20(a) claims.

### 2. ASG's Financial History

As relevant here, by 1997, ASG had 54,364 inmates under 32 government contracts. In

6

June 2000, ASG received a three-year contract to provide healthcare for 19,500 inmates in Maryland that increased ASG's annual revenues by an estimated $48 million. Id. at ¶ 30. Catalano, ASG's chairman, "told investors that ASG was preparing bids for new contracts that could generate up to $425 million in annual revenues starting in 2001." Id. On December 19, 2000, ASG announced a three-year contract of $100 million per year, to provide healthcare services at New York City's Rikers Island prison. Id. By the end of 2000, ASG was serving 176,563 prisoners under 130 contracts. Id.

After the first quarter[3] of 2001, ASG posted earnings with a 81% increase in revenue, and effectively met its costs estimates. Id. at ¶ 32. Yet, ASG's expense ratio increased to 91.8%, compared to 90.1% in 2000. Id. ASG cited "lower margins and lower financial risks associated with [SPP's] pharmacy business, acquired in September 2000," and the start-up costs under the Rikers Island contract. Id. ASG told investors not to be alarmed, as its projected expense ratio would decrease over the next few quarters to prior level in 1999 of 89.9% and 90.1% in 2000. Id.

By the second quarter of 2001, ASG's medical expense ratio increased to 99.7% of its revenues and that increase was attributed to ASG's pharmacy costs and PHS's off-site utilization expenses. Id. at ¶ 30. Plaintiffs allege ASG lost $3.39 per diluted share for the quarter. Id. After the second quarter report, ASG's stock dropped 57.6% in value to $8.04 from $18.94 per share. Id. ASG also wrote-off special charges of $22 million, with $13 million in goodwill and $6 million in reserves for future losses. Id. ASG announced its loss of seven (7) prison contracts, representing $100 million, that cut its EBITDA (Earnings Before Interest, Taxes, Depreciation,

---

[3]Plaintiffs focus on ASG's quarterly financial reports and statements. Plaintiffs contend that such focus is necessary to understand their theory of the Defendants' liability.

and Amortization) in half to $4 million for each of the next two quarters. Id. Plaintiffs allege that ASG's 2001 second quarter results revealed that increases in expenses could significantly impact quarterly operating results. By September 17, 2001, ASG's costs increased such that ASG was unlikely to meet its projected $4 million EBITDA target for either the third or fourth quarters of 2001. Id. On October 25, 2001, ASG's stock price hit an all-time low of $1.53 per share (on a split adjusted basis). Id. at ¶ 41. On November 14, 2001, ASG's third quarter results were EBITDA of $2.8 million and expense ratio of 95% of revenues. Id.

By the end of the 2001 fourth quarter, ASG had a $27.8 million loss, with an $18.3 million charge for additional reserves for expected future losses on five prison contracts. Id. at ¶ 36. For that quarter, with expenses at 94.6% of revenues, ASG decided to renegotiate or terminate its contracts with cost-plus-fee arrangements, so as to increase its revenue by 88%. Id. ASG's EBITDA rose to $3.2 million (from $2.8 million in 2001), but total revenue fell to $134 million from $140 million in each of the two prior quarters. Id. Defendant Catalano cited $2 million in unreserved losses from five full-risk contracts. Id. at ¶ 45. ASG repeated these results in its Form 10-K filed with the SEC on or about March 28, 2002 that Defendants Catalano and Taylor signed. Id. at ¶ 113.

Defendant Catalano assured investors that the ASG would monitor its subsidiaries' costs and ASG would no longer enter into the unprofitable full-risk contracts because ASG's management was "intensely focused on addressing" its costs and had "developed a corrective course of action focused on a return to predictable financial results." Id. at ¶¶ 34 and 35. ASG announced Defendant Taylor as its new chief financial officer to replace Walker Choppin, ASG's former banker at Bank of America who had held his ASG position for more than a year. Id.

8

In its periodic reports to the SEC, ASG acknowledged that its gross margins were the primary metric to evaluate its business performance, including SPP's performance. Id. at ¶ 37. Plaintiffs allege that Arthur I. Henderson of Jefferies & Company, a market analyst cited ASG's medical expense ratio, *i.e.*, healthcare expenses as a percentage of revenue, as the critical factor in ASG's success and warned that "subtle changes in this ratio can have a significant impact on the company's profitability." Id.

As to ASG's revenue and cost recognition policy, ASG's March 28, 2002 SEC 10-K Report stated, in pertinent part:

Revenue and Cost Recognition

The Company's contracts with correctional institutions are principally fixed price contracts adjusted for census fluctuations. Revenues earned under contracts with correctional institutions are recognized in the period that services are rendered. **Cash received in advance for future services is recorded as deferred revenue and recognized as income when the service is performed.**

Healthcare expenses include the compensation of physicians, nurses and other healthcare professionals including any related benefits and all other direct costs of providing the managed care. **The cost of healthcare services provided or contracted for are recognized in the period in which they are provided based in part on estimates, including an accrual for unbilled medical services rendered through the balance sheet dates.** The Company estimates this medical claims reserve using an actuarial analysis prepared by an independent actuary taking into account historical claims experience (including the average historical costs and billing lag time for such services) and other actuarial data.

Id. at ¶ 113 (emphasis added).

On April 22, 2002, in public statements and its filings with the SEC, ASG reported for its results for the first quarter ending March 31, 2002: healthcare revenues of $137.9 million, healthcare expenses of $129.3 million, EBITDA of $4.5 million, net income of $2 million and earnings per share of $0.36 per basic and diluted share. Id. at ¶ 114. Defendant Catalano

9

allegedly commented, in pertinent part:

> "The initiatives we have implemented, coupled with an emphasis on strong fiscal discipline, are producing results. **Our improved performance in the first quarter reflects the actions we are taking. Our management team is intensely focused, and our mission remains clear."**

Id. (emphasis added).

On July 23, 2002, ASG's press release and Form 10-K filed with the SEC for the quarter ending June 30, 2002 revealed healthcare revenues of $138.5 million, healthcare expenses of $129.9 million, EBITDA of $5.1 million, net income of $5.3 million and earnings per share of $0.97 per basic share and $0.95 per diluted share. Id. at ¶ 116. Defendant Catalano explained that: **"The Company's focus on improving its contract portfolio is producing solid results**. Our progress accelerated during the second quarter as more contracts came up for renewal." Id. (emphasis added). ASG's October 21, 2002 press release described a closed private placement financing of $4.56 million in gross proceeds. Id. at ¶ 118.

By June 2003, ASG's stock price was $10 per share, and by September 2003 increased to $13 per share. On September 24, 2003, ASG's stock price closed above $14 per share for the first time in nearly three years. In its Form 10-K for fiscal year 2003, ASG cited $2.1 million or 0.4% in additional expenses of its healthcare revenues. Id. at ¶ 203. ASG, however, noted its inability to retain qualified health care provides as a cause for losses of its contracts or its ability to gain contracts. Id. at ¶ 203. In 2003, ASG had 800 doctors, 3,050 nurses and 300 independent contractors that included dentists, psychiatrists, psychologists and physicians. Id. at ¶ 205.

ASG's 2003 fiscal year report in its Form 10-K reflects ASG's disclosures that any costs could be controlled and that excess insurance coverage had been secured for catastrophic

10

illnesses.

> When preparing bid proposals, the Company estimates the extent of its exposure to cost increases, severe individual cases and catastrophic events and attempts to compensate for its exposure in the pricing of its bids. **The Company's management has experience in evaluating these risks for bidding purposes and maintains an extensive database of historical experience. Nonetheless, increased or unexpected costs against which the Company is not protected could render a contract unprofitable.** In an effort to manage risk of catastrophic illness or injury of inmates under contracts that do not limit the Company's exposure to such risk, the Company maintains stop loss insurance from an unaffiliated insurer covering 100% of its exposure with respect to catastrophic illnesses or injuries for annual amounts in excess of $500,000 per inmate up to an annual per inmate cap of $2.0 million.

(Docket Entry No. 70-9, Appendix 4 at p. 9) (emphasis added).

In its Form 10-K for its 2003 fiscal year, ASG stated: "The Company evaluates segment performance based on each segment's gross margin without allocation of corporate selling, general and administrative expenses, interest expense or income tax provision benefit." Id. In addition, in its 2003 fiscal year report on Form 10-K, ASG represented that:

> Management establishes reserves for the estimated losses that will be incurred under these insurance policies using internal and external evaluations of the merits of the individual claims, analysis of claim history and the estimated reserves assigned by the Company's third-party administrator. . . . **The Company is not aware of any material unasserted claims and, based on its past experience, would not anticipate that potential future claims would have a material adverse effect on its consolidated financial position or results of operations.** Any adjustments resulting from the review are reflected in current earnings.

(Docket Entry No. 60, Amended Complaint at ¶ 211) (emphasis added). ASG repeated these statements in a Form 10-Q Report issued on May 10, 2004, August 9, 2004, November 9, 2004, March 14, 2005, May 10, 2005, and August 9, 2005. Id. at ¶ 212.

During a February 24, 2004 telephone conference call with analysts on the results of ASG's fourth quarter of 2003 and its 2003 fiscal year, Defendant Taylor allegedly made the

11

following statements about ASG's gross margins that Plaintiffs allege to be false.

> Patrick Swindle - *Avondale Partners - Analyst*
>
> Good morning, gentlemen. The gross margin from continuing operations was about 8.3% during the fourth quarter. The gross margin assuming the guidance for '04 is 6.9%, can you talk a little bit about what drove the gross margins during the fourth quarter, and the implications that has maybe for 2004?
>
> Mike Taylor - *American Service Group, Inc. - CFO*
>
> We gave full-year guidance for 2003 of 6.5% of total gross margin. We ended the year at 6.6% for the full year. So we did slightly better in the fourth quarter than we anticipated. The main drivers there, you know, we did get some benefit from a couple of new contracts that started later in the year, that operated a little better than we anticipated out of the box; but we do anticipate that over their complete term that they will operate at margins as we would have expected in the pricing of those contracts. So we got a little benefit there.
>
> \* \* \*
>
> **[O]ur daily costs run about $1.6, $1.7 million on an average day.** So those are a couple of factors that I would put into that as well, but overall, I mean, we're fairly pleased that we're giving guidance that says we can take total gross margins as a company up another step from the 6.6% that we did for full year this year to 6.9% next year.

Id. at ¶¶ 148, 149 (emphasis added).

Plaintiffs allege that these statements are false because ASG's "gross margins were inflated and eventually were restated." Id. at ¶ 150. Further, Plaintiffs allege that during this call, Taylor and Catalano concealed the fact that their gross margin results were only achieved through fraudulent cost-cutting schemes implemented at PHS and SPP, including improper cost and revenue reporting at SPP and PHS's intentional disregard of proper medical care and staffing requirements. Id.

On July 2, 2004, ASG's press release announced a $6.8 million charge or loss on its

contract with Maryland Department of Public Safety and Correctional Services. Id. at ¶ 156.

ASG also announced its financial projection for 2004 with increased anticipated revenues of

$668 million from $658 million and net income to $24 million up from $22.5 million. Id. As

cited in that release, ASG expected performance improvements in its contract portfolio and its

pharmacy division during the second half of that year. In a July 27, 2004 conference call with

securities analysts on ASG's 2004 financial results, Defendant Taylor allegedly made the

following statements on ASG's gross margins in the second quarter of 2004.

> Michael Lamb - Wealth Monitors - Analyst
>
> You referenced the 7 percent gross margin expectation, Mike, for the second half.
> Can you tell us where that is going to [come] from? I assume you are referencing
> just for 43 and 4 combined; is that correct?
>
> **Mike Taylor - America Service Group, Inc. - SVP and CFO**
>
> **That is correct. I would anticipate something in the 7.3 to 7.5 range for the
> Company in the second half of the year. It is primarily coming from repricing
> of contracts.** This whole process that we have been on for the last 3 years at this
> point is over time to slowly increase margins of the Company back closer to where
> they were historically. So we do anticipate we will see that improved performance
> in the second half of this year. And that is really what has been contemplated all
> along. Maybe a little better than we thought initially as we started the year are our
> expectations for the second half at this point.

Id. at ¶ 157 (emphasis added).

On October 25, 2004, ASG issued a press release on its financial results for the third

quarter ending for September 30, 2004. In Plaintiffs' view, Catalano described ASG's cost

increases as a "unique" event and stated that ASG's future looked bright:

> We are disappointed in the additional reserve necessary to cover losses under our
> Maryland contract through its expiration on June 30, 2005. In the meantime, the
> Company will faithfully adhere to the terms of our contract and continue our
> commitment to provide quality healthcare to our patients. **We remain confident in**

13

**the long-term prospects of the Company. The rest of our contract portfolio
continues to produce expected financial results, cash balances are increasing
and we are debt free as of the end of the quarter.** We are further encouraged by
our selection by the State of Vermont as the provider to negotiate a contract for
healthcare services with the Agency of Human Services, Department of
Collections.

Id. at ¶ 159 (emphasis added).  In addition, ASG increased its "guidance" for 2004:

2004 Guidance

The Company is maintaining most aspects of its previous guidance for 2004 full-
year results. . . .The Company is maintaining its guidance for pre-tax income from
continuing and discontinued operations of approximately $24.0 million in 2004,
excluding the $5.2 million charge of the settlement of the Florida legal matter in
the first quarter and the $12.8 million increase in the Company's loss contract
reserve in the second and third quarters.  Depreciation, amortization and interest
expense is expected to be approximately $6.0 million in 2004, consistent with
previous guidance. . . .[T]he Company is increasing its guidance for Total revenues
from continuing and discontinued operations to $685.0 million for 2004, an
increase of $17.0 million from previous guidance. . . .

Id. at ¶ 160.

In an October 26, 2004 telephone conference call with securities analysts, the Defendant

Catalano allegedly made the following statements about SPP:

Tyson Bauer - Wealth Monitors - Analyst

Okay. And one quick follow-up. On the pharmacy side, on previous calls
we've talked about the opportunities of winning pharmacy business or increasing
that part of the business, even in situations where you are not the provider, whether
the state provides the service or even some of your competitors, in which you could
actually, because of your efficiencies in the pharmacy, pick up that business. We
have not heard a whole lot on that end as of recent times. Where does the pharmacy
stand in operating as its own independent entity and growing going forward?

Michael Catalano - American Service Group - Chairman, President and CEO

Well, most recently, SPP was successful in being awarded the Kentucky
statewide pharmacy contract for the DOC system up there. We have a current
similar bid pending with the state of Oklahoma in which we expect a decision

14

relatively soon. So those opportunities do continue. They are selective opportunities in terms of bidding with or against competitors. We've looked at that on a couple of occasions. I think there's, understandably, some degree, or second look, or reticence on the part of competitors to bring SPP into a contract situation, but that's certainly happened before. **And quite frankly, SPP has been a significant part of generating the new business revenue growth on a year-to-date basis.** So we continue to see good opportunities there going forward, particularly with the emphasis just nationally on the continued escalation of pharmacy costs.

Id. at 161 (emphasis added).

In a February 7, 2005 press release, after ASG's fourth quarter financial results, ASG's shares were $0.07 higher than the market estimate of $0.36 per share, and ASG announced guidance of $170.4 million and $690.9 million respectively. Id. at ¶ 164. ASG further explained that it had "significantly reduced the volatility of its contract portfolio over the last several years" and provided an increased 2004 projected on earnings per share from $1.42 to $1.53 per share. Id. ASG described its accomplishment of its costs control:

> The Company has significantly reduced the volatility of its contract portfolio over the last several years by a process of shifting its preferred contract structure from a full-risk model to a shared-risk model Shared-risk contracting model provide aggregate limits, or "caps," to the Company's exposure to hospitalization and other off-site medical expenses and benefit taxpayers by eliminating any risk premium or margin that would otherwise be associated with the probability of such costs exceeding mutually agreed upon thresholds and allowing taxpayers to share in any savings if such costs are less than those agreed upon."

> This ongoing process of adjusting the Company's contract portfolio has resulted in 88% of the Company's healthcare contracts and all pharmacy contracts as of December 31, 2004, representing 74% of Total Revenues in the fourth quarter, **having structures that limit the Company's exposure to increases in hospitalization and other off-site medical expenses."**

Id. at ¶ 164 (emphasis added).

In its first initial guidance for its 2005 fiscal year, ASG predicted earnings that Plaintiffs

15

allege are significantly worse than any other time during the Class Period, including EDITDA of $10-$11 million with total revenues of $660 million. Id. at 92. This resulted in earnings of $0.39 per share. In 2004, ASG's EBITDA was $29.3 million with revenues of $690 million and earning per share of $0.82. On April 26, 2005, the ASG issued a press release announcing its financial results for the first quarter of 2005, the period ending March 31, 2005. Id. at ¶ 167. In its release, Defendant Catalano asserted that "[t]he Company produced solid financial results in the first quarter that were consistent with our expectations." Id.

After a series of published reports in the *New York Times* in late February and early March, 2005 about PHS's business practices, discussed infra, ASG's stock price fell more that 16%. Id. at ¶ 303. On April 27, 2005, Defendant Taylor held a conference call with securities analysts to discuss the details of the financial results for ASG's fourth quarter in 2005. Id. at ¶ 168. During this conference, the securities analysts asked about the ASG's ability to maintain its gross margins and expenses and Taylor responded as follows:

> Anton Hie - Jefferies & Co. - Analyst
>
> Okay. How about the current quarter month-end here, do we think we will see the margins holding steady here, now that some of those utilization issues that caused the fourth-quarter spike are behind us?
>
> Mike Taylor - America Service Group - CFO
>
> Well, we are always subject to that volatility, and that is kind of the point on those contracts. **Certainly at this point, Anton, things are tracking along with our expectations. That is why we've maintained the guidance that we have for the full year. So early into the second quarter, we don't see anything that changes that impression.**

Id. (emphasis added).

In a July 27, 2005, telephone conference call with securities analysts on ASG's financial

16

results in the second quarter of 2005, specifically ASG's gross margins and EBITDA, Taylor

allegedly responded to the following question in Catalano's presence:

> Anton Hie - Jefferies & Co. - Analyst
>
> A couple questions. Your EBITDA margin in the first half was around 4.5%; and based on the midpoint of your guidance, it looks like you are shooting for 5% for the full year, implying a significant improvement in the back half. I wonder if you could talk a little bit about, A, where you might see those improvements; whether that is being confirmed so far in the month of July; and how sustainable you think those levels might be going forward in light of the current competitive environment.
>
> **Mike Taylor - America Service Group - CFO**
>
> **Anton, we do expect the second half to see an increase in that EBITDA margin, as you pointed out, in our guidance. The 4.5% or so for the first half certainly was a solid start for the year. All along we had expected to see an improvement in that in the second half. That improvement primarily is going to be driven by the gross margin percentage improving in the second half. Once again that was in line with our initial expectations for what the year would hold. So it is really going to be a gross margin improvement in our expectations that gets us to that higher level of EBITDA margin.** In fact, we will probably see the SG&A expense percentage creep up somewhat in the second half, because of the reduced revenues the Company has from making cuts in that area. But they probably won't offset the revenue drop. So I think the 2.5% that we saw in the first half there is going to go up for the second half. So it is a gross margin driven equation.
>
>                       \*   \*   \*
>
> I think the last part of your question is whether that is sustainable or not. We have said over time that the Company's performance would certainly be more evidenced on the gross margin line, post the old Maryland contract, no matter which direction that rebid went. I think you are starting to see that in the continuing gross margin in the first half. And certainly we expect that to be enhanced even more in the second half.

Id. at ¶ 171 (emphasis added).

In the second half of 2005, ASG's third quarter financial statements revealed its costs had

risen to 99.7%, the highest level since 2001. Id. at ¶ 89. SPP's net revenue dropped 18%. Id. at ¶ 90. ASG missed its guidance on net income by 83.5%; EBITDA fell by 42.5% and earnings per share by 74.5%. Id. at 91. ASG cited "disappointing financial performance" in the second half of its 2005 fiscal year, with continuing costs from SPP accounting compliance costs and PHS's costs under government contracts for failing to provide outpatient care and staffing at inpatient clinics. Id. at ¶ 93. ASG experienced an increase in medical malpractice claims against PHS. Id. at ¶ 94. After *The New York Times'* articles, ASG increased its reserves for malpractice claims by $6.1 million. Id. ASG reported $4.4 million in net income for the 2005 fiscal year. Id.

In a March 16, 2006 telephone conference with analysts and investors, Defendants Catalano and Taylor cited continuing losses and lower gross margins as SPP, in the wake of SPP's accounting scandal and PHS's practices that Taylor described as "a major distraction to SPP's business," as well as lost business. Id. By the end of ASG's 2005 fiscal year, the number of inmates under ASG's contracts fell to 130,000 from 200,000 and the facilities under contract fell to 260 from 300. Id. at ¶ 103. ASG also had increased costs for off-site expenses and staffing of healthcare in Wyoming, Alabama and Vermont. Id. at ¶ 94.

Upon news reports of ASG's internal investigation of SPP's and PHS's practices, ASG's stock dropped 29%. Id. at ¶¶ 304-305. On March 16, 2006, ASG revealed the results of that investigation that is discussed infra. Id. at ¶ 305. Later, ASG had to restate five years of its financial statements. Id. In that restatement, ASG admitted that SPP's practices resulted in material weaknesses to ASG's previously issued financial statements. Id. at ¶ 179. ASG's internal investigation revealed that ASG had overstated its income by at least $2.1 million and

18

reduced its 2001 earnings by $347,000 with increased tax liability of $355,000.[4]  SPP's

customers were overcharged by at least $3.6 million.  Id.  ASG also cited its customers that were

undercharged $5.9 million during the same time period, but deemed those undercharges

uncollectible.  Id.  ASG reduced guidance for earnings for the end of the Class Period.  Id. at ¶¶

88-98, 224.  SPP lost contracts to provide pharmaceuticals to inmates in Kentucky, Fulton

County, Georgia, and Caddo County, Louisiana.  Id. at ¶ 110.

In its 2005 Form 10-K, ASG admitted that "key members of SPP's senior management"

had improperly established and used accrual and reserve accounts at SPP to manage earnings to

meet expectations for performance.  Id. at ¶ 75.  Plaintiffs refer to these practices as "cookie jar

accounting."  Plaintiffs allege that ASG's reference about the "key members" of management in

its restatement was to Defendants Hartman and Bryson.

On May 10, 2006, ASG's released its first quarter 2006 results showing medical expenses

(94.5% of revenues), SG&A expenses (3.5%), gross margin (5.5%) and a net loss of $989,000.

Id. at ¶ 95.  In its Form 10-K and its 2005 Report on Form 10-Q and in its annual report filed with

ASG's April 28, 2006 Proxy Statement, ASG cited its Audit Committee's 27 meetings during an

internal investigation to receive and discuss reports and updates on the investigation and to

provide direction and guidance for SPP and PHS.  ASG expended $7.7 million for its internal

investigation into these matters.  Id. at ¶ 74.  ASG's total healthcare expenses for the fourth

quarter of 2005 were $142.1 million, or 94.9% of total revenues, as compared with $158.2

million, or 92.9% of total revenues, in the prior year quarter.  ASG's total healthcare expenses for

---

[4]Docket Entry No. 69, Defendants' Memorandum at p. 11 citing the Defendants'
restatement, but the Court cannot locate this statement at the cited reference.

the year ended December 31, 2005 were $612.8 million, or 94.4% of total revenues, as compared with $644.0 million, or 93.3% of total revenues, in the prior year period. To assist in the understanding of ASG's restatement, the Court now reviews SPP's and PHS's alleged business practices.

### 3. SPP's Accounting Practices

As to the causes of ASG's financial losses, SPP's contracts defined the correct reference price to calculate the amounts charged for prescription drugs. Under these contracts, state and federal prisons are entitled to a pro rata share of a manufacturer's or distributor's price discounts and rebates provided to SPP. Id. at ¶¶ 185 and 222. In addition, prisons can return unused drugs for credits against their accounts with SPP. Id. SPP's computerized system ("CIPCS"), however, was designed to track only one purchase price for any drug. Id. at ¶¶ 59-63, 185-191. As a result, SPP could not track different prices from different vendors. Id. According to a former SPP manager, who allegedly reported directly to SPP's chief executive officers, Hartman and Bryson deliberately took advantage of CIPCS's shortcomings to manipulate the timing of price changes by inputting prices increases into the system before sending customer invoices and by delaying entry of falling prices until after invoices with the former higher prices had been issued. Id. at ¶¶ 55, 60.

Plaintiffs allege that CIPCS was widely known as incapable of tracking multiple prices for drugs purchased from different vendors so as to assure incorrect billings of its customers in accordance with the terms of their contracts. Id. at ¶¶ 159-61, 185-191. The obviousness of CIPCS's defective design is allegedly reflected in the single cost for each drug despite SPP's purchase of drugs from multiple vendors at constantly changing prices. Id. at ¶¶ 159, 185.

20

Plaintiffs assert that CIPCS's obviousness in failing to credit SPP's customers for returned drugs is apparent because the CIPCS showed that SPP was selling more drugs at that price than it had purchased, clearly reflecting that drugs were being sold more than once without the price being lowered. Id. at ¶¶ 59-61, 185-191. ASG's replacement system, SPIN, was also unable to provide accurate pricing information, track inventory, verify shipments, or assure proper customer billing. Id. at ¶¶ 187-191. Yet, the Defendants allegedly failed to alert investors to SPIN's problems and continued to certify falsely the adequacy of ASG's control system. Id. ¶ 181.

A former SPP fulfillment manager allegedly recounted how SPP established an aggressive budget to earn $100,000 a month from reselling drugs that had been returned at a higher wholesale price above SPP's purchase price of those drugs, allegedly providing a further disincentive to assure customers receive proper credits. Id. at ¶¶ 55, 61. A former SPP executive allegedly states that customers were rarely credited for returned drugs, because to do so made it more difficult to meet the $100,000 revenue target. Id. at ¶ 55.

SPP's "Procedural Manual" allegedly stated that returns would not be credited for drugs that were returned in a blister pack that had been partially used, even though SPP procedures also called for the remaining drugs to be manually removed from the blister pack and resold to other customers. Id. at ¶ 55.[5] Plaintiffs allege SPP's policy of failing to credit customers for returned drugs was well known to Hartman and Bryson, and also to Catalano and Taylor. Id. A former SPP manager stated that during the due diligence preceding the SPP acquisition, Defendants

---

[5]As a security measure, drugs provided to inmates were typically shipped in blister packs containing a 30-day supply of drugs, which SPP internally referred to as "bingo cards." When an inmate was released or transferred to another facility before the entire supply in their blister pack had been used, the partially used blister pack would be returned to SPP.

21

Hartman, Bryson, Catalano and Taylor were aware of these practices and SPP's procedure manual. Credits for returned drugs were the exception, not the rule at SPP, and Hartman or Bryson personally approved credits, but only for customers who complained regularly.  Id.

At a dinner with other executives in Boston in the fall of 2005, defendant Hartman and Northeast Region Group Vice President Geoff Persley openly discussed the reselling of returned drugs, which they referred to as "recycling," in a manner that implied to at least one of their dining companions that the practice was illegitimate.  Id. at ¶ 62.  Excess profits were generated through such sales, which typically involved frequently prescribed drugs, such as insulin, or expensive medications, such as antipsychotics and drugs used to treat HIV.  Id.

Two former SPP pharmacists and other ex-employees, including a former vice president reported that SPP's billings were "always wrong" and that SPP frequently overcharged PHS, by billing for pharmaceuticals that were never ordered, or double-billing for prescriptions that were filled, or failing to credit PHS for returns.  Id. at ¶ 64.  According to the former vice-president, SPP's billing was "closely watch[ed]" by the administrators.  Id.  In an October 24, 2005 article in the *Nashville Business Journal*, Catalano referred to Randy Beaman, SPP's controller and SPP's "corporate liaison to supplier and distributor" as raising the issues about SPP's practices during a "routine contact with the internal audit program."  Id. at ¶ 70.

Plaintiffs allege that at Bryson's direction, SPP also made illegal drug purchases. "[S]everal former SPP employees revealed that SPP was also illegally purchasing drugs from Canada in order to save money, and then overcharging customers for the costs of those drugs."  Id. at ¶ 65.  Plaintiffs allege:

> Two high-level pharmacists working out of SPP's Franklin headquarters confided

in co-workers that SPP was secretly importing drugs from Canada through a clandestine facility located in Maryland. Another pharmacist employed by SPP learned of the practices prior to 2004, and was told by the high-level pharmacists that the illegal importation was ongoing through at least the beginning of 2006. **The high-level pharmacists told this person that SPP would purchase the drugs from Canada at a reduced cost, then charge its customers the full U.S. average wholesale price for the drugs, which would often be triple the price SPP paid or more. The two high-level pharmacists confided in at least one other employee at the facility where they worked. The second employee was told in 2005 that the drugs were being illegally imported at Bryson's specific direction. The pharmacists who followed Bryson's directions described their fear of their liability for this misconduct, including the potential loss of their licenses.** The two pharmacists involved in the illegal practices have since left ASG, according to one of the employees who had spoken with them about these practices.

Id. at ¶ 65 (emphasis added).

These accounting and other practices at SPP allegedly continued for five years. Id. at ¶ 67. Thus, Plaintiffs allege that during the class period, ASG's, SPP's and the individual Defendants' statements and reports to investors that SPP's expenses were under control, were false and/or misleading. Plaintiffs allege that the Defendants deliberately ignored or concealed SPP's improper accounting and other practices that had temporarily reduced ASG's costs by violating SPP's contracts with its customers. Id. at ¶¶ 42-82, 308-316.

In its restatement, ASG conceded ASG's controls over SPP "were not designed or operating effectively to reduce to remote the likelihood that material errors in healthcare revenues, health-care expenses, accounts receivable, inventories and accrued expenses would be prevented or detected in a timely manner" nor would ASG's contracts "reasonably assure the accurate and timely capture of SPP customer contract billing information and billing of SPP customers in accordance with contract terms." ¶¶ 80 and 179. ASG specifically cited that these missing controls "resulted in restatements of previously issued financial statements" for the past five years.

23

Id. at ¶179. Thus, Plaintiffs allege that ASG's earlier financial statements were false or that the Defendants' were reckless in reporting such false information about SPP.

### 4. PHS's Medical Practices

As to PHS's role in these events, Plaintiffs allege that to reduce PHS's expenses, the Defendants focused on eliminating PHS's high costs of off-site hospitalization and expensive drug regimens. Id. at ¶¶ 45-53. Plaintiffs assert that former PHS employees reported that PHS management routinely cut budgets for utilization of hospitals off-site to reduce PHS's costs and to meet budgeted targets. Id. at ¶ 312. With PHS's reduction of these expenses, ASG assured investors that ASG's medical expense margins, i.e., the ratio of healthcare expenses to revenues would be notably below the 99.7% level that ASG experienced in the second quarter of 2001. Id. at ¶¶ 38-40. After a series of *New York Times* articles about PHS, ASG's medical malpractice expenses rose "much greater than reflected in [ASG's] SEC filings" and such increases are alleged to be the direct result of PHS's improper cost-cutting practices, specifically denying necessary healthcare and medications to inmates to reduce artificially expenses under PHS's government contracts. Id. at ¶¶ 218-219.

ASG also allegedly directed the "floating," of nurses, quick settlement of malpractice claims, and understaffing at institutions that resulted in contract penalties. Id. As specific examples of those PHS practices, Plaintiffs allege the following:

> In September 2005, PHS paid $350,000 to settle a claim arising from the death of Ruth Hubbs, an inmate at the Leon County (Fla.) Jail from an overdose of Doxepin, an antidepressant. According to a lawsuit filed by Hubbs' Estate, the antidepressant had been administered over her objections pursuant to a PHS policy of rarely using a safer but more expensive medication, and despite signs that the inmate was chronically over medicated with Doxepin in the two weeks before her death. According to a former high ranking official with the Florida Department of

24

Corrections, SPP typically used the cheapest drugs even if there was a better alternative that would ensure less hospitalization of inmates.

In 2004, following a death of a newborn infant delivered by an inmate at the Hillsborough County (Fla.) Jail, PHS conducted an internal audit of medical records at the facility. A former employee who participated in the audit said it was initiated because senior managers "knew" that PHS had been negligent for failing to attend to the infant after birth, including as the result of investigative reports which were sent to defendant Hartman and other senior official No medical records audit had previously been conducted at the jail, despite contractual requirements to do so, because PHS had not provided auditing staff to the prison.

In April 2005, a court-appointed monitor reported that **PHS' HIV treatment records at Alabama's Limestone Correctional Facility "reflect thousands of doses of medications ordered by physicians that have either not been given, or have been given without being documented. Interviews with patients, chart reviews and feedback from physicians support the concern that patients are not consistently given the medications that have been ordered for them for serious life-threatening conditions."** A follow-up report submitted in July 2005 found that PHS' record keeping had improved, but **there were still numerous concerns with HIV patients not receiving proper medication or medical treatment. In addition, the report found that the prison had only one doctor and one nurse to serve more than 2,000 inmates: "By all measures, this staffing is inadequate to meet the medical needs of this complex patient population ."**

Similar complaints about understaffing of jail facilities were repeatedly raised in Bristol County, Massachusetts. **During 2005, the prison was understaffed by as many as 10 nurses below contractual requirements. Catalano was repeatedly told about the staffing shortages by jail representatives, including Peter Berthiaume and Henry Groby. In addition, at a meeting in the health service administrator's office at the jail in 2H05, a PHS vice president went over the understaffing problems with Catalano in detail. The vice president said: PHS' refusal to comply with the contractual staffing requirements stemmed from its refusal to pay nurses according to local rates for their services. The vice president learned from colleagues that this was a recurring issue throughout the company and similar problems had cropped up in other areas of the country, including Alabama and Wyoming.**

**The New York Times' expose also revealed another improper practice called "floating" which helped PHS avoid governmental fines imposed for understaffing prisons and inadequate care. The practice consisted of sending doctors or nurses with a backlog of patients at one prison to another where**

25

**there were fewer inmates to treat, "simply to avoid fines."** Further, several former and current PHS employees, including three senior clinicians, reported that when there were too few doctors to "float," PHS employees would simply falsify prison records, signing in at one prison without seeing any patients as one former clinician stated, "[t]he practice is clearly fraudulent."

At the end of the Class Period, **ASG revealed that one of its clients had imposed $1.8 million in contractual penalties for failing to provide proper staffing levels at its facilities.** ASG withheld the identity of the client, but admitted that at least $600,000 of the penalties were valid charges under the contract.

Id. at ¶ 51. The penalty provisions in its contracts were to incentivize PHS to maintain proper staffing.

To obscure these practices, ASG and PHS allegedly fired numerous PHS administrators and officers who reported and complained of mismanagement or prison understaffing, including an employee who reported directly to Catalano. Id. at ¶ 52.

### 5. Published Reports about ASG, SPP and PHS

Plaintiffs allege that as early as January 2003, PHS's senior management were allegedly told of PHS's deliberate practice of delaying or denying prescription medications and medical treatment to inmates to increase PHS's profits and gross margins. Id. at ¶ 140. In 2003, the Defendant Catalano was so informed. Id. A PHS medical director in Idaho filed a legal action against PHS alleging a corporate practice of providing insufficient health care. Id. In 2005, ASG fired numerous employees who complained about such practices. Id. at ¶¶ 52, 53.

The significant event is *The New York Times* publication of a series of articles from February 27, 2005 through March 1, 2005 about PHS's business practices due to deaths of two New York inmates under PHS's care. Id. at ¶ 45. ASG initially denied the first report. Id. at ¶ 303. *The New York Times'* disclosed PHS's practice of cutting medical services to cut costs. Id.

26

In the two deaths, and eight others across upstate New York, state investigators say they kept discovering the same failings: medical staffs trimmed to the bone, doctors under qualified or out of reach, nurses doing tasks beyond their training, prescription drugs withheld, patient records unread and employee misconduct unpunished.

Id. at ¶ 46. A state investigation of those deaths found evidence that PHS was repeatedly cutting services to cut costs. Id.

The *New York Times* articles reported interviews of correctional officials in other states that reported inmates' deaths and other injuries at PHS managed facilities that were attributed to PHS's decision to lower costs so as to maximize profits. In summary, these articles reported:

- In late 2000, government investigators looking into a string of inmate deaths in upstate New York noticed a pattern of inadequate healthcare under PHS' direction, including, "low-level employees [who] were doing work normally done by better-credentialed people" and nurses without proper qualifications or working on suspended licenses, "making medical decisions and pronouncing patients dead." **"Our sense was that what we were dealing with was not clinical problems but business practices," said James E. Lawrence, the New York State Commission of Correction's director of operations.**

- **In 2001 in Broward County, Florida, three state court judges ordered PHS to stop withholding expensive psychiatric drugs from inmates after they witnessed a parade of inmates showing up in court incoherent. "My impression was that it was money," Judge Susan Lebow told The New York Times. "The doctors were under corporate direction to not continue the medications."**

- **Judge Lebow's concerns were eerily similar to those that had been raised in 2000 by five juvenile court judges in New York who had repeatedly taken PHS to task for failure to provide juvenile inmates with proper medication.** Brooklyn Family Court Judge Philip C. Segal held the company in contempt for failing to give HIV medication to a teenage inmate. Bronx Judge Harold J. Lynch ordered a teenage girl to be taken out of PHS' care when she tried to commit suicide after her psychiatric medication was inexplicably discontinued. **After another 14-year old girl suffering from bipolar disorder whose medication had been similarly discontinued appeared in Judge Paula J. Hepner's**

27

**courtroom, the jurist told city lawyers that the incident "is not just a single case. It's many cases."**

- And following one inmate's death **in 2001, the New York State Commissioner of Corrections denounced PHS as "reckless and unprincipled in its corporate pursuits, irrespective of patient care."**

Id. at ¶ 47 (emphasis added). In 2005, a Maryland grand jury allegedly found that PHS's management pressured PHS's staff to cut costs that caused PHS to restrict inmates medications, off-site hospitalization, or laboratory tests. Id. at ¶ 50.

Plaintiffs allege that PHS's failures to provide necessary medications or treatment are attributable to ASG's corporate policies and practices implemented by the Defendants to reduce PHS's losses and thereby increase ASG's profits. Id. at ¶ 53. Plaintiffs alleged ASG failed to disclose to investors PHS's deliberate decisions to deny necessary medical care. ASG actually told investors that ASG was unaware of any conditions that would cause material cost increases under their contracts. Id. at ¶¶ 22. Plaintiffs allege PHS's and ASG 's management, specifically Catalano, were aware of these practices, as were PHS's officers and employees. Id. at ¶¶ 52, 53 and 219. Plaintiffs allege that a former PHS vice president specifically warned the Defendant Catalano about problems with inadequate staffing and inaccurate billing. Id. at ¶ 52.

### 6. ASG's Internal Investigation

On October 24, 2005, ASG announced the formation of an Audit Committee aided by outside counsel and independent accountants to conduct an internal investigation into improper accounting by SPP. Id. at ¶ 67. This investigation included SPP's failures to credit customers for returned products or to credit required discounts and rebates so as to manage SPP's earnings. Id. The SEC was notified and commenced its investigation, as did the United States Attorney for the

28

Middle District of Tennessee. Id. As stated earlier, ASG's Audit Committee met 27 times and its investigation costs totaled $7.7 million.

In its restatement, and ASG's Form 10-K Report for fiscal year 2005, ASG admitted SPP's practices and cited ASG's faulty and nonexistent internal controls at SPP, stating, in pertinent part:

- "SPP did not charge its customers (including PHS) in accordance with applicable contracts...SPP charged customers more than SPP's purchase invoice cost or the applicable third party reference price... SPP failed to properly credit certain customers with discounts, rebates or buy-in savings, and, in certain instances, failed to provide customers with contractually required credit for the return of pharmaceutical products."

- "The Audit Committee's investigation also found that key members of SPP's senior management inappropriately established and used certain reserves during various periods over the last five years to more closely match SPP's reported earnings to budgeted results."

- "As a result of the findings made during the investigation, the Audit Committee recommended significant strengthening to the Company's system of internal controls and compliance function. **In addition, management determined that material weaknesses existed in the Company's internal control structure," including a lack of required controls over SPP's revenues, expenses, accounts receivable, inventories and accrued expenses.**

Id. at ¶ 76 (emphasis added). This 10-K report also described "certain other issues, relating to accruals for rebates and inventory valuation, which resulted in changes to [ASG's] previously reported financial results." Id. at ¶ 77. SPP's management was described as failing to follow corporate expenditure and disbursement policies and "a number of issues" on the faulty implementation of a new computer system at SPP in June 2005. Id. at ¶ 74.

Plaintiffs allege that in its restatement, ASG admitted its lack of internal controls:

the lack of adequate "internal control" procedures necessary to reasonably detect

29

material errors in revenues, expenses, accounts receivable, inventory, and accrued expenses, or to assure that SPP's customers were being charged in compliance with the terms of their contracts. Among the internal controls that were lacking during the Class Period were procedures necessary to ensure that contractual pricing terms were allowed when customers were billed, returns were properly credited to customer accounts, and **ASG[]'s finance department reviewed SPP's monthly accounting reconciliations to prevent improper use of accruals and reserves and other accounting gimmicks used to manage or inflate reported results. See ASG[]'s FY05 Report on Form 10-K, Item 9A. For example, as recounted by numerous former employees of SPP, ASG[] and its management knew that the Company had recurrent problems with maintaining accuracy in financial reporting due to its use of computer systems that were unable to properly manage sales and expense dates. CIPCS, SPP's system in place at the start of the Class Period, or earlier, repeatedly caused lost or delayed prescription orders, and was unable to track and apply contract-specific pricing terms. CIPCS' replacement, called SPIN, was plagued with similar problems from the time it was improperly launched in June 2005. See infra §VII.C.**

**In its FY05 Report on Form 10-K . . . ASG[] admitted that the Company's internal controls "were not designed or operating effectively to reduce or remote the likelihood that material errors [in ASG[]'s consolidated financial statements] would be prevented or detected in a timely manner." In admitting that these internal controls did not exist, and that the controls that were in place during the Class Period were not properly designed or operating correctly, ASG[] tacitly acknowledged that the statements it had made during the Class Period about its purportedly effective system of internal controls, and the Sarbanes-Oxley certifications Catalano and Wright signed each quarter attesting to the adequacy of those controls, were false.**

**This admission, together with the nature and extent of the accounting fraud, and the fact that it continued, purportedly undetected, for *five years*, aptly demonstrates that ASG[], Catalano and Wright were all reckless in claiming, and certifying, that ASG[] had effectively designed and operated internal controls during the Class Period. Either Catalano or Wright knew of the internal control problems during the Class Period, based on the repeated inspections they made of the control procedures at ASG[] and its subsidiaries, or they were deliberately reckless in signing those certifications by failing to make a reasonable inspection to assure that the internal controls were both adequately designed and properly operating, as claimed in the certifications.**

Id. at ¶¶ 79, 80 at 81 (emphasis added).

Plaintiffs allege that ASG issued "restated annual financial statements for FY03 and FY04,

30

and "restated selected financial data" for FY01 and FY02 in its FY05 Report on its Form 10-K.

ASG cited the cumulative impact of its practices as reducing ASG's income by $355,000. Id. at ¶

83. According to Plaintiffs, ASG buried an admission in its annual report for fiscal year 2005 that

ASG's earlier quarterly and annual reports filed with the SEC during the Class Period were

misleading:

> The Company did not amend its previously filed Annual Reports on Forms 10-K or
> Quarterly Reports on Forms 10-Q for the restatement. **Accordingly, the financial
> statements and other information contained in such reports should no longer
> be relied upon.**

Id.

Plaintiffs alleged that the Defendants refused to amend ASG's prior reports that would

reveal the full extent of ASG's quarterly manipulations and disclosed only the "cumulative"

impact of these illegal practices to obscure the extent of ASG's false and misleading statements

about its financial condition. Id. at ¶ 84. Plaintiffs allege that a quarter-to-quarter analysis would

have revealed ASG's holding back of earnings in improper reserves and accrual accounts until its

results are better than forecasted, and ASG's use of those reserves to supplement earnings in

quarters where results are worse than forecast. In a word, Plaintiffs allege ASG under-reported

expenses in "bad" quarters when they were incurred and waited instead for a "good" quarter in

which they could be reported without missing financial targets. Id. at ¶ 85.

Plaintiffs also allege that ASG included adjustments previously made to unreported results

in the third quarter of 2005. The effect was to reduce the reported cumulative impact of its

practices in its prior reports:

> **The Audit Committee's investigation also found that key members of SPP's
> senior management inappropriately established and used certain reserves**

31

**during various periods over the last five years to more closely match SPP's reported earnings to its budgeted results.** The aggregate effect of the adjustments necessitated by the Audit Committee's findings related to this issue has been determined by the Company to be an increase in previously reported pre-tax income of approximately $355,000, in the aggregate, since January 1, 2001, **although it should be noted that different periods are affected by different amounts and that certain of the adjustments necessitated by the Audit Committee's findings related to the third quarter of 2005, which has not been previously reported.** The employees who the Company determined, based on the investigation, were responsible for these actions **were terminated or are no longer employed by the Company** or SPP.

Id. at ¶ 87 (emphasis added).

According to Plaintiffs, ASG cited the Treadway Commission's Committee of Sponsoring Organizations ("COSO") standards for its internal controls. COSO requires direct involvement by management in establishing controls and continual monitoring and analysis of controls. Id. at ¶¶ 174 and 286. ASG's 2005 Report on Form 10-K, recognized that "[a] material weakness is a significant deficiency, or combination of significant deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected." Id. at ¶ 286. In addition, ASG admitted that its internal controls "were not designed or operating effectively to reduce to remote the likelihood that material errors [in ASG 's consolidated financial statements] would be prevented or detected in a timely manner." Id. at ¶ 80. Plaintiffs also allege manipulations of SPP's accounting and that ASG's admissions were relegated to footnotes in ASG's restatement of its financial statements. Id. at ¶¶ 3-98, 104-105, 177-183, 220-231, 236-251.

Plaintiffs cite 58 months of ASG's and SPP's unchecked errors as evidence that Defendants Catalano and Taylor were at least reckless in signing certifications about ASG's internal controls for reporting its finances. Plaintiffs also allege that ASG's refusal to amend its

32

prior reports avoided revelation of the full extent of its quarterly manipulations, as ASG elected to disclose only the alleged "cumulative" impact over this five-year period so as to hide ASG's manipulation of improper reserves, accruals and customer charges to meet its quarterly performance standards. Id. at ¶¶ 84, 85.

On December 7, 2005, ASG fired Defendant Bryson. Id. at ¶ 71. On December 9, 2005, ASG fired Defendant Hartman. Id. "Other key SPP employees also resigned or were fired during or after the investigation, including Clinical Pharmacy Vice President Peter Mikhail, who left in October 2005 and Vice President of Client Services Joe Facchinei, who left in March 2006." Id. Two members of the Audit Committee, Richard M. Mastaler (a director since 1999) and Carol R. Goldsbery, resigned. Id. at ¶ 72. Mastaler contended that Catalano should be fired. Id.

### 7. GAAP Violations

Plaintiffs next allege that the Defendants repeatedly violated GAAP standards in reporting ASG's financial condition despite that ASG's filings and financial statements that represented their compliance with GAAP standards. Id. at ¶¶ 232-266. Plaintiffs set forth a series of financial statements and cite GAAP rules and bulletins to reflect their contentions that ASG's restatement of its finances for 2000, 2001, 2003, 2004 and 2005 violated GAAP standards. Id. at ¶ 234 through 237, 241, 243, and ¶¶ 248 and 292. Plaintiffs add that after the restatement, ASG failed to amend its Form 10-K reports that contained the same information that needed to be revised in other ASG documents. Id. at ¶ 243.

ASG's report on its 2005 fiscal year 10-K reflects that ASG reclassified revenues as "discontinued operations." Id. at ¶¶ 246-247. Based upon GAAP standards, Plaintiffs allege that these "reclassifications" are adjustments with tax consequences. Id. at ¶ 246. Plaintiffs also

33

allege ASG overstated its income for continuing operations by $18 million and understated its income from discontinued operations by $14 million. Id. at ¶ 248.

### 8. Individual Defendants

The individual Defendants include current or former high-level executives of ASG and or SPP or PHS who during the Class Period, managed ASG, SPP and/or PHS. Id. at ¶ 329. With their offices and responsibilities, each individual Defendant is alleged to have participated or was privy to the creation and development of SPP's and PHS's business practices as well as to the reporting of ASG's, SPP's and PHS's internal budgets, plans, projections and/or reports. The individual defendants Catalano and Taylor allegedly had significant personal interaction with Hartman and Bryson about SPP's and PHS's practices as well as personal knowledge about ASG's statements to the investing public about ASG's financial condition. Each individual defendants allegedly had access to the adverse undisclosed information about ASG's actual financial condition and performance and either knew or recklessly disregarded these practices' adverse effects in their representations about ASG's financial condition. Id. at ¶¶ 332 and 333. Plaintiffs allege, in sum:

> All defendants participated in making the statements complained of herein regarding ASG's financial results. ASG issued the statements. SPP provided the information regarding its own results. Defendants Hartman and Bryson were responsible for overseeing the preparation of SPP's financial statements.

Id. at ¶ 132. See also ¶¶ 8, 22-23, 147, 194, 197, 311-31 5, 328-334.

Plaintiffs' specifically allege that the firing of ASG's former chief financial officer in 2001 placed Catalano, Taylor, Hartman and Bryson on notice that their jobs could be in jeopardy if they were unable to control ASG's costs. Id. ¶ 35. As noted earlier, market analysts opined that

34

"subtle changes in this ratio [of healthcare expenses to revenues like the 0.4% increase in 2002] can have a significant impact on the company's profitability." Id. ¶ 37.

According to Plaintiffs, the individual defendants were also motivated to engage in or to fail to correct these business practices so as to secure promotions, to enhance their compensation, to inflate the value of ASG's stock price, and to create higher cash value for sales of their stock options. Id. at ¶¶ 30-40, 92-98, 319-324. Plaintiffs also allege that ASG executives who are not named Defendants, sold more than 607,000 shares for more than $11.5 million during the class period. Id at ¶¶ 320-322. "During the Class Period before the fraud was revealed, Burton C. Einspruch, director, sold 17,000 shares of ASG's stock (over 86% of his available shares) in November 2003 for proceeds of $341,697. Richard M. Mastaler, director, dumped 74,286 ASG shares (86% of his available shares) in November 2003 for $1.4 million in proceeds. Lawrence H. Pomeroy, Senior VP and Chief Development Officer, sold 50,092 shares of ASG's stock (over 97% of his available shares) for $1.2 million in proceeds. William C. Stapleton, director, unloaded 20,625 shares (100% of his available shares) in November 2003 for nearly $400,000 in proceeds. Finally, Richard D. Wright, Vice Chairman of Operations and director, sold 102,907 shares (90.62% of his available shares) for $2.144 million in insider proceeds." The Court addresses other specific allegations against each Defendant.

### a. ASG and SPP

To minimize undue repetition, ASG is the corporate parent of SPP and PHS. ASG filed consolidated financial statements in its corporate name as parent based upon SPP's and PHS's financial reports. See Docket Entry No. 70, Attachment thereto. As reflected by the firings of Bryson and Hartman, ASG controlled SPP and PHS. ASG issued the financial reports and press

35

releases that included the contract performances of SPP and PHS.  SPP's accounting practices

provided the financial information that is the predicate for a substantial part of ASG's restatement.

In an October 24, 2005 statement, ASG excluded SPP's sales to PHS from ASG's internal

investigation.  Plaintiffs cite ASG's explanation that those contracts were excluded as "the

Company is financially responsible for the cost of pharmaceuticals".  Id. at ¶ 229.

### b. Catalano

Catalano attended the monthly operational meetings with Hartman that included line-by-

line review of SPP's and PHS's costs.  Id. at ¶¶ 3, 11.   Each quarter, Catalano specifically

certified that he had personally "designed" or "caused" controls at ASG "including its

consolidated subsidiaries" to be prepared and that Catalano found these controls to be both

adequate and operating correctly.  Id. at ¶¶ 176-178.  Catalano, as ASG's chief executive officer,

also signed ASG's SEC filings and financial statements that were relied upon by market analysts

and  investors.  Id. at ¶¶ 20-21, 132.

In its April 22, 2002 press release, ASG reported its financial results for the first quarter of

2002, ending March 31, 2002, with healthcare expenses of $129.3 million, EBITDA of $4.5

million, net income of $2 million and earnings per share of $0.36 per basic and diluted share.  In

that press release, Defendant Catalano allegedly stated in pertinent part:

> "The initiatives we have implemented, coupled with an emphasis on strong fiscal
> discipline, are producing results. **Our improved performance in the first quarter
> reflects the actions we are taking. Our management team is intensely focused,
> and our mission remains clear."**

Id. at ¶ 114 (emphasis added).

In his sworn certifications under the Sarbanes-Oxley Act on the accuracy and reliability of

36

ASG's financial statements and internal controls, Catalano certified that:

1. I have reviewed this quarterly report on Form 10-Q of America Service Group Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. **The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e) for the registrant and have:**

a) **Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision,** to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) **Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report** our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

c) **Disclosed in this report any changes in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and**

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or

37

operation of internal control over financial reporting which are
reasonably likely to adversely affect the registrant's ability to record,
process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or
other employees who have a significant role in the registrant's
internal control over financial reporting.

Id. at ¶ 176 (emphasis added). Catalano signed additional such certifications in 2002, 2003, 2004

and 2005. Id. at ¶¶ 177, 178.

In his certifications of ASG's10-K reports filed with SEC in 2003, 2004 and 2005,

Catalano verified as follows:

**Disclosure controls and procedures are the Company's controls and other
procedures that are designed to ensure that information required to be
disclosed in the reports that the Company files or submits under the Securities
Exchange Act of 1934, as amended, (the "Exchange Act") is recorded,
processed, summarized and reported, within the time periods specified in the
SEC's rules and forms. Disclosure controls and procedures include, without
limitation, controls and procedures designed to ensure that information
required to be disclosed in the reports that the Company files under the
Exchange Act is accumulated and communicated to management, including
the Chief Executive Officer and Chief Financial Officer, as appropriate, to
allow timely decisions regarding required disclosure.**

As of [the end of the period covered by this report], the Company evaluated under
the supervision and with the participation of management, including the Chief
Executive Officer and Chief Financial Officer, the effectiveness of the design and
operation of the Company's disclosure controls and procedures, pursuant to
Exchange Act Rule 13a-14 and Rule 13a-15. Based upon that evaluation, **the
Chief Executive Officer and Chief Financial Officer concluded that the
Company's disclosure controls and procedures are effective in timely alerting
them to material information that is required to be included in the Company's
periodic SEC filings. There have been no significant changes in the
Company's internal controls during [the period covered by this report] that
have materially affected, or are reasonably likely to materially affect, the
Company's internal control financial reporting.**

Id. at ¶ 178 (emphasis added). Given ASG's later admissions about the lack of effective internal

38

controls at ASG and SSP, Plaintiffs allege that these certifications are materially false and misleading statements to investors about effective internal controls in ASG's financial operation. Id. at ¶ 179. Plaintiffs allege that as investors, they relied upon these quarterly statements to provide assurances that ASG's financial and other information was accurate.

In addition, Plaintiffs allege that Catalano, who had never sold any of his ASG stock, liquidated more than 90% of his stock in October and November, 2003 after ASG told investors that ASG's expenses margins were under control and after ASG's stock price rose to $14.00 a share. Id. at ¶ 319. During the Class Period, Catalano received $5.2 million from his stock sales. Id. at ¶¶ 320, 321.

### d. Taylor

Taylor, ASG' chief financial officer, oversaw ASG's financial operations. Id. at ¶¶ 20-21, 132. According to ASG's website, Taylor is responsible for "direct[ing] the Company's SEC reporting," "corporate accounting," "PHS site accounting," "operational analysis," "budgeting," and "investor relations." Id. at ¶ 21. As the primary spokesperson on ASG's financial condition, Taylor controlled and directed the flow of financial information concerning SPP. Id. at ¶¶ 148-149, 153-1 54. Taylor also signed the same certifications about ASG's financial condition as Catalano. Those certifications are quoted supra at pp. 36-38 Id. at ¶¶ 20-21, 132, 176-178.

According to Plaintiffs, during telephone calls with analysts and investors, Taylor made a series of false or misleading statements about SPP's and ASG's financial condition. Id. at ¶¶ 158, 162, 225-227. On February 24, 2004, after the announcement of ASG's fourth quarter results in 2003, Taylor allegedly made the following statements about ASG's gross margins:

Patrick Swindle - Avandale Partners - Analyst

39

Good morning, gentlemen. The gross margin from continuing operations was about 8.3% during the fourth quarter. The gross margin assuming the guidance for '04 is 6.9%, can you talk a little bit about what drove the gross margins during the fourth quarter, and the implications that has maybe for 2004?

Mike Taylor - America Service Group Inc. - CFO

We gave full-year guidance for 2003 of 6.5% of total gross margin. We ended the year at 6.6% for the full year. So we did slightly better in the fourth quarter than we anticipated **The main drivers there, you know, we did get some benefit from a couple of new contracts that started later in the year, that operated a little better than we anticipated out of the box;** but we do anticipate that over their complete term that they will operate at margins as we would have expected in the pricing of those contracts. So we got a little benefit there.

Id. at ¶ 148 (emphasis added).

In the subsequent telephone call in response to an analysis questions, defendant

Taylor stated about ASG's gross margins:

Mike Taylor - America Service Group Inc. - CFO

**[O]ur daily costs run about $1.6, $1.7 million on an average day.** So those are a couple of factors that I would put into that as well, but overall, I mean, we're fairly pleased that we're giving guidance that says we can take total gross margins as a company up another step from the 6.6% that we did for full year this year to 6.9% next year.

Id. at ¶ 149 (emphasis added). Plaintiffs allege these statements are false and misleading in light

of SPP's and PHS's known practices that inflated ASG's gross margins as reflected by ASG's

restatement. Plaintiffs also allege that Taylor concealed these misleading facts about SPP's and

ASG's practices. Id. at ¶ 150.

During a April 27, 2004 telephone conference call with securities analysts to

Taylor described the increase in ASG's healthcare expenses and gross margins as follows:

**Primarily as a result of the new business booked in the first quarter, we are increasing our 2004 guidance for total revenues to 658 million for the year as**

40

**compared with our previous guidance of 650 million.** This guidance is based only on contracts in operation currently, and does not factor in any potential new business that may be realized later in the year. . . .

Id. at ¶ 153 (emphasis added). In that same conference, Taylor referred to ASG's ability to cut its costs for its customers:

> **Yes, we do think that one of the things we're bringing to our clients this year, and I mentioned it I think on the year-end call, is that we think we're going to be able to mitigate to some degree for our clients their level of increase in cost of our services** and so that - we are seeing some of that based on our mix of cost and that would be our current hopes and anticipation.

Id. at ¶ 154 (emphasis added).

Plaintiffs specifically identify as misrepresentations, Taylor's alleged statements about an "increase" in ASG's EBITDA margin in the second half of 2005 and that ASG was "comfortable" with its gross margins. Id. at ¶¶ 172 and 173. Plaintiffs allege these statements are factually misleading in their failure to disclose SPP's and PHS's actual practices that inflated ASG's actual margins and profit expectations. Id.

In its March 15, 2006 press release and on the March 16, 2006 telephone conference call with analysts and investors, Taylor attributed ASG's "disappointing" results for the second half of 2005 to the internal investigations of SPP's practices of overcharging customers, concealing manufacturer and distributor discounts and rebates from customers, and cited PHS's "unexpected adverse development in pending malpractice claims" in 2005. Id. at ¶ 217. Taylor stated that ASG's professional liability expense of $6.1 million was higher than ASG's original expectations of $2.9 million.

Plaintiffs allege that Taylor concealed from investors the extent of ASG's exposure to malpractice claims. Those malpractice claims were greater than Taylor previously represented in

41

ASG's SEC filings. Id. at ¶ 218. Plaintiffs allege that after public disclosures in the *New York Times* articles about PHS's practices, and despite his personal knowledge of these practices, Taylor made statements attempting to deflect attention from ASG to PHS so as to avoid disclosure of ASG's manipulations of its reserves to meet forecasted results.

In October and November 2003, Taylor first sold more than 90% of his ASG stock. Id. at ¶¶ 319-20. These stock sales occurred after Taylor told investors that ASG's costs were under control. Id. Taylor received $842,897 from these stock sales. Id. at ¶¶ 320 and 321.

### e. Hartman

Hartman who is alleged to control ASG and SPP, was initially responsible for managing all of SPP's operations and approving SPP's financial practices. Id. at ¶¶ 22-23, 28, 55, 58, 62-63, 65, 311, 314. Hartman was SPP's President and chief executive officer and later ASG's executive vice- president. Id, at ¶ 22. Plaintiffs allege that Hartman oversaw the preparation of SPP's financial statements that were bases for ASG's allegedly false consolidated financial statements filed with the SEC. Id. at ¶ 132. According to alleged witnesses, former managers and employees at SPP, Hartman assumed direct control to manipulate drug prices and sales to PHS and other SPP customers. Hartman allegedly decided whether to approve credits for returned drugs. Id. at ¶ 155. As an ASG officer, Hartman attended the monthly operational meetings with Catalano that included line-by-line accounting of SPP's costs. Id. at ¶¶ 3, 11. Plaintiffs allege that ASG fired Hartman because ASG deemed Hartman responsible for instituting SPP's practices that caused ASG's restatement of its financial reports. Id. at ¶ 147.

In 2004, Hartman was also PHS's chief operating officer and prepared PHS's financial statements for ASG. Id. at ¶¶ 22 and 132. Hartman also allegedly received reports of PHS's

42

improper patient and medication practices during the period covered by ASG's restatement. Id. at ¶ 158. Hartman attended the monthly operational meetings with Catalano that included line-by-line review of PHS's costs. Id. at ¶¶ 3, 11.

### f. Bryson

Plaintiffs allege that Bryson controlled ASG and SPP. Id. at ¶ 352. In October 2004, Bryson, a certified accountant with over 17 years of experience with Price Waterhouse, began as SPP's president and chief executive officer. Id. at ¶ 23. Bryson was allegedly Hartman's "right-hand man" and became SPP's chief executive officer when Hartman assumed that position at PHS. Id. at ¶ 28. Hartman or Bryson directly approved credits for returned drugs. Id. at ¶ 55. Bryson supervised quarterly inventories at SPP. Id. at ¶ 56. Plaintiffs allege that a witness from SPP will testify that Bryson personally directed SPP's illegal importation of drugs from Canada. Id. at ¶ 65. According to witnesses who oversaw contacts with SPP, Bryson personally handled complaints involving government contracts and conducted weekly SPP management meetings to address important problems. Id. at ¶¶ 190, 314.

On March 15, 2006, ASG told investors that the "key managers" responsible for SPP's practices were no longer with ASG. After the revelation of conduct in ASG's internal investigation, Bryson was fired. Id. at ¶ 71. Plaintiffs assert the inference that Bryson was one of the "key members" of ASG's and SPP's management responsible for ASG's losses. Id. at ¶ 222.

In closing of this review of the amended complaint, Plaintiffs allege that their factual allegations about the Defendants' false statements and wrongful conduct are based, in part, upon information from former ASG, SPP and PHS executives and employees who possess firsthand knowledge of the circumstances about ASG, SPP and PHS, ASG's restatement of its financial

43

condition and had direct contact with the individual Defendants.  Id. at ¶¶ 24,55-72, 185-190, 311-315.

## B. Conclusions of Law

### 1. Standard of Review

For a Rule 12(b)(6) motion to dismiss, the Court must deny the motion if the complaint's factual allegations "raise a right to relief above the speculative level."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 1964-65 (2007).  "[T]he allegations of the complaint should be construed favorably to the pleader."  Scheuer v Rhodes, 416 U.S. 232, 236 (1974) and the Court must "treat all of the well-pleaded allegations of the complaint as true."  Miree v. Dekalb County, Ga., 433 U.S. 25, 27 n.2 (1977).  Yet, a legally sufficient complaint, "requires more than bare essentials of legal conclusions."  Columbia Natural Resources, Inc. v. Tatum, 58 F.3d 1101, 1109 (6th Cir. 1995) and the district court "need not accept as true legal conclusions or unwarranted factual inferences."  Morgan v. Church's Fried Chicken, 829 F.2d 10, 12 (6th Cir. 1987).

Moreover, where, as here, fraud is alleged, Fed. R. Civ. P. 9(b) requires that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  In a securities action, the heightened pleading standards are to be evaluated as set forth by the Supreme Court in Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 127 S.Ct. 2499 (2007):

> Our task is to prescribe a workable construction of the "strong inference" standard, a reading geared to the PSLRA's twin goals: to curb frivolous, lawyer-driven litigation, while preserving investors' ability to recover on meritorious claims.
>
> We establish the following prescriptions: **First**, faced with a Rule 12(b)(6) motion

44

to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true.  **Second**, courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.  The inquiry, as several Courts of Appeals have recognized, is whether **all** of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.  **Third,** in determining whether the pleaded facts give rise to a "strong" inference of scienter, the court must take into account plausible opposing inferences.

* * *

The strength of an inference cannot be decided in a vacuum.  The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts?  To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff.  The inference that the defendant acted with scienter need not be irrefutable, i.e. of the "smoking-gun" genre, or even the "most plausible of competing inferences[.]" . . . [T]he inference of scienter must be more than merely "reasonable" or "permissible" - it must be cogent and compelling, thus strong in light of other explanations.  A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

* * *

[A]llegations must be considered collectively; the significance that can be ascribed to an allegation of motive, or lack thereof, depends on the entirety of the complaint. . . . [T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically.  In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?

* * *

We emphasize, as well, that under our construction of the "strong inference" standard, a plaintiff is not forced to plead more than she would be required to prove at trial.  A plaintiff alleging fraud in a § 10(b) action, we hold today, must

45

plead facts rendering an inference of scienter **at least as likely as** any plausible opposing inference.

127 S.Ct. at 2509-13 (citations omitted) (emphasis in original).

The Sixth Circuit recently restated the Supreme Court's view on a Rule 12(b) motion in a securities action as follows:

> Although the PSLRA left the term undefined, the Supreme Court has concluded that Congress adopted the "strong inference" standard in order to raise the bar for pleading scienter. Tellabs, 127 S.Ct. at 2509. In doing so, the PSLRA "implement[ed] procedural protections to discourage frivolous litigation." Helwig v. Vencor, Inc., 251 F.3d 540, 547 (6th Cir. 2001).
>
> In Tellabs, the Supreme Court prescribed a specific three-step analysis that district courts are to follow in considering a motion to dismiss private securities claims arising under Section 10(b). First, "courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." Tellabs, 127 S.Ct. at 2509. Second, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Id. (citation omitted). At the second stage, the relevant question "is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Id. (emphasis in original). The PSLRA does not permit a plaintiff merely "to allege facts from which an inference of scienter rationally could be drawn." Id. at 2510. Rather, the inference of scienter "must be cogent and compelling, thus strong in light of other explanations." Id.
>
> Finally, in determining whether the pleaded facts give rise to a strong inference of scienter, "the court must take into account plausible opposing inferences." Id. at 2509. Because the strength of an inference "cannot be decided in a vacuum," the district court must conduct a "comparative inquiry" and assess the possible competing inferences that could be drawn from the allegations, including "plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." Id. at 2509-10.
>
> In defining how this framework is to be applied, the Supreme Court expressly held that a complaint will survive a motion to dismiss so long as "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 2510 (emphasis

46

added). Thus, where two equally compelling inferences can be drawn, one demonstrating scienter and the other supporting a nonculpable explanation, Tellabs instructs that the complaint should be permitted to move forward. See id. at 2510 n. 5; ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 59 (1st Cir. 2008) ("In other words, where there are equally strong inferences for and against scienter, Tellabs now awards the draw to the plaintiff.").

Frank v. Dana Corp., 547 F.3d 564, 570-71 (6th Cir. 2008).

The Sixth Circuit ruled that the provisions of Fed. R. Civ. P. 8 and the requirement of Rule 9(b) are to be read in conjunction with each other. Michaels Bldg. Co. v. Ameritrust Co., N.A., 848 F.2d 674, 679 (6th Cir. 1988). In Blount Financial Services v. Walter E. Heller & Co., 819 F.2d 151, 153 (6th Cir. 1987), the Court explained that "Rule 9(b) requiring 'averments of fraud . . . with particularity' is designed to allow the District Court to distinguish valid from invalid claims in just such cases as this one and to terminate needless litigation early in the proceedings." (citation omitted). Rule 9(b) is also intended "to provide a defendant fair notice of the substance of a plaintiff's claim in order that the defendant may prepare a responsive pleading." American Town Ctr. v. Hall 83 Assocs., 912 F.2d 104, 109 (6th Cir. 1990).

Under Ameritrust, the plaintiff can satisfy Rule 9(b)'s requirements by pleading the circumstances of the fraud, not the evidence. 848 F.2d at 680 n.9. Since Ameritrust, however, the Sixth Circuit reiterated the rule of this Circuit that FRCP 9(b) requires that fraud be pleaded with particularity. To satisfy FRCP 9(b), a plaintiff must "at a minimum **'allege the time, place and contents of the misrepresentations upon which [the plaintiff] relied.'**" American Town Center, 912 F.2d at 109 (quoting Bender v. Southland Corporation, 749 F.2d 1205, 1216 (6th Cir. 1948)) (emphasis added).

In addition, where the fraud claims involve multiple defendants, the alleged fraudulent conduct of each defendant must be set forth separately or otherwise the complaint is legally

47

deficient under Rule 9(b).

> The defendants now before the Court comprise a varied group of accounting firms and their employees; law firms and their employees; and bank employees. Yet the complaint makes no attempt to distinguish among them.

> This is inadequate; each individual defendant must be appraised separately of the specific acts of which he is accused, especially in a case involving multiple defendants. 'The complaint, therefore, may not rely upon blanket references to acts or omissions by all of the 'defendants,' for each defendant named in the complaint is entitled to be apprised of the circumstances surrounding the fraudulent conduct with which he individually stands charged.'

Benoay v. Decker, 517 F.Supp. 490, 493 (E.D. Mich. 1981), aff'd 735 F.2d 1363 (6th Cir. 1984)[6]

(quoting McFarland v. Memorex Corp., 493 F.Supp. 631, 639 (N.D. Cal. 1980), (quoting

Jacobson v. Peat, Marwick, Mitchell & Co., 445 F.Supp. 518 (S.D.N.Y. 1977))).

More recently in City of Monroe Employees Ret. Sys. v. Bridgestone, 399 F.3d 651, 689-90 n. 32 (6th Cir. 2005), the Sixth Circuit noted a split in precedents, including a decision of a district court in this Circuit, on the "group pleading" exception to Rule 9(b). This exception applies "in cases of corporate fraud when the false and misleading is conveyed in a prospectus, annual reports, press releases or other group published information [where] it is reasonable to presume that these are the collective actions of officers." Id. at 689-90 ns. 32 and 33 (citing *inter alia*, In re SmarTalk Teleshares, Inc. Sec. Litig., 124 F. Supp. 2d 527, 545 (S.D. Ohio 2000). This principle could apply here as Plaintiffs cite ASG's 10-K reports and its press releases that commented on the financial performance of ASG, SPP and PHS. Bridgestone, however, did not adopt this exception and expressly declined to do so. 399 F.3d at 690. In any event, the Sixth Circuit followed Benoay on this specific pleading rule in United States ex rel. Bledsoe v.

---

[6] The Supreme Court cited Benoay approvingly albeit on other grounds. Central Bank of Denver, N.A. v First Interstate Bank of Denver, N.A., 511 U.S. 164, 170 (1994)

Community Health Systems, Inc., 342 F.3d 634, 643 (6th Cir 2003). Despite the group pleading

exception's relevance, this Court is bound by existing Sixth Circuit precedents in Bledsoe and

Benoay that a fraud claim requires specific allegations as to each defendant's alleged involvement

in the securities violations.

   In addition, in evaluating Plaintiffs' complaint under Fed.R.Civ.P. 10(c), any matters

attached to the pleadings are considered part of the pleadings. In Weiner v. Klais and Co., Inc.,

108 F.3d 86, 98 (6th Cir. 1997), the Court reiterated the general rule that: "Matters outside the

pleadings are not to be considered by a court in ruling on a 12(b)(6) motion to dismiss." (citations

omitted). Yet, the Court recognized an exception in securities cases, but only for papers filed by a

defendant and referred to a plaintiff's complaint.[7]

> The [district] court held . . .it would consider 'only those exhibits submitted by the
> defendant which can properly be considered incorporated by reference into the
> complaint, and, thus, a part of the pleadings.'
>
> **Rule 10(c) is permissive, and a plaintiff is under no obligation to attach to his
> complaint documents upon which his action is based. However, a defendant
> may introduce certain pertinent documents if the plaintiff fails to do so.**
> Otherwise, a plaintiff with a legally deficient claim could survive a motion to
> dismiss simply by failing to attach a dispositive document upon which it relied.
> Hence, the Seventh Circuit has held that **"[d]ocuments that a defendant attaches
> to a motion to dismiss are considered part of the pleadings if they are referred
> to in the plaintiff's complaint and are central to her claim."** We believe that
> **this approach is appropriate.**

Id. at 89 (emphasis added and citations omitted) (quoting Venture Assocs. Corp v. Zenith Data

Sys. Corp, 987 F.2d 429, 431 (6th Cir. 1993); See also Nejman v. NLO, Inc., 108 F.3d 1546, 1555

---

[7]This principle does not extend to extrinsic evidence Katt v. Titan Acquisitions, Ltd., 133
F. Supp. 2d 632, 637-38 (M.D. Tenn. 2000). The Court cannot presume the truth of the extrinsic
information nor use such information in evaluating the pleadings. Bridgestone, 399 F.3d at 665;
see also Logan v. Denny's, Inc., 259 F.3d 558, 581 n.5 (6th Cir. 2001) (court may not take
judicial notice of disputed facts).

(6th Cir. 1997).

Thus, of the factual materials submitted by the Defendants, (Docket Entry Nos. 70, 71 and 79) and the Plaintiffs (Docket Entry No. 74 and 75), the Court will consider only those documents referred to in Plaintiffs' Amended Complaint.

### 2. Rule 10(b) & PLSRA Standards

Plaintiffs' claims seek recovery under §10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, prohibits the use "in connection with the purchase or sale of any security . . .[of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . .[.]" Pursuant to this section, the Securities Exchange Commission promulgated Rule 10b-5, that provides in pertinent part:

> It shall be unlawful for any person, directly or indirectly, . . .
>
> ***
>
> To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading. . . .

17 C.F.R. § 240.10b-5.

The Supreme Court described the purpose of the 1934 Act as follows:

> The 1934 Act was designed to protect investors against manipulation of stock prices. See S. Rep. No. 792, 73d Cong., 2d Sess., 1-5 (1934). Underlying the adoption of extensive disclosure requirements was a legislative philosophy: "There cannot be honest markets without honest publicity. Manipulation and dishonest practices of the market place thrive upon mystery and secrecy." H. R. Rep. No. 1383, 73d Cong., 2d Sess., 11 (1934). This Court "repeatedly has described the fundamental purpose' of the Act as implementing a philosophy of full disclosure.'"

Basic Inc. v. Levinson, 485 U.S. 224, 230 (1988) (quoting Santa Fe Industries, Inc. v. Green, 430

50

U. S. 462, 477-478 (1977) (quoting SEC  v. Capital Gains Research Bureau, Inc., 375 U. S. 180,

186 (1963))).

In 1995, Congress enacted the Private Securities Litigation Reform Act ("PSLRA") that

requires specificity in pleadings in private securities litigation before commencement of

discovery:

> (b) Requirements for securities fraud action.  (1) Misleading statements and
> omissions.  In any private action arising under this title [15 U.S.C. §§ 78a et seq.]
> in which the plaintiff alleges that the defendant - -
>
> (A) made an untrue statement of a material fact; or
>
> (B) omitted to state a material fact necessary in order to make the statements
> made, in the light of the circumstances in which they were made, not misleading;
>
> the complaint shall specify each statement alleged to have been misleading, the
> reason or reasons why the statement is misleading, and, if an allegation regarding
> the statement or omission is made on information and belief, the complaint shall
> state with particularity all facts on which that belief is formed.
>
> (2) Required state of mind.  In any private action arising under this title. . . . [15
> U.S.C. §§ 78a et seq.], the complaint shall, with respect to each act or omission
> alleged to violate this title, state with particularity facts giving rise to a strong
> inference that the defendant acted with the required state of mind.
>
> (3) Motion to dismiss, stay of discovery.  (A) Dismissal for failure to meet
> pleading requirements.  In any private action arising under this tile [15 U.S.C. §§
> 78a et seq.], the court shall, on the motion of any defendant, dismiss the complaint
> if the requirements of paragraphs (1) and (2) are not met.
>
> \*   \*   \*
>
> (B) Stay of discovery.  In any private action arising under this title [15 U.S.C. §§
> 78a et seq.], all discovery and other proceedings shall be stayed during the
> pendency of any motion to dismiss, unless the court finds upon the motion of any
> party the particularized discovery is necessary to preserve evidence or to prevent
> undue prejudice to that party.

15 U.S.C. §78u-4(b)(1)(A), (b), 2 and 3(b).

51

The purpose of the PSLRA was to "protect investors, issuers and all who are associated with our capital markets from abusive securities litigation" as well as "to implement [] need[ed] procedural protections to discourage frivolous litigation." H.R. Conf. rep. 104-369, 104th Cong. 1st Sess. 31, 31 (1995). Although Congress added the necessity of "strong inference," the Sixth Circuit later clarified that the PSLRA did not alter the recklessness standard for scienter in federal securities actions. In re Comshare, Inc. Sec. Litig., 183 F.3d 542, 550 (6th Cir. 1999). As to the elements of a Section 10(b) claim, the Sixth Circuit recently restated the elements as follows: "To state a securities fraud claim under Section 10(b), a plaintiff 'must allege, in connection with the purchase or sale of securities, the misstatement or omission of a material fact, made with scienter, upon which the plaintiff justifiably relied and which proximately caused the plaintiff's injury.'" Dana Corp., 547 F.3d at 569-70 (quoting In re Comshare Inc. Sec. Litig., 183 F.3d 542, 548 (6th Cir. 1999)).

Plaintiffs assert multiple theories of liability for their Section 10(b) and Rule 10(b)(5) claims: (1) Defendants' misrepresentations or misleading statements on ASG's costs, statement of reserves and profitability; (2) the Defendants engaged in manipulative scheme to omit material facts about the actual practices of SPP and PHS in breaching their contracts to reduce ASG's costs in connection with the sale of ASG's securities; (3) the Defendants' motive and opportunity for these securities violations; and (4) the Defendants' fraud on the market in their concealment of PHS's and SPP's actual practices.

The core of the Defendants' motion focuses on the insufficiency of Plaintiffs' allegations of scienter for the various aspects of ASG's omissions and its subsidiaries' alleged financial and business practices as well as the individual Defendants' related misrepresentations and

52

omissions.  Yet, in various parts of their supporting memoranda, the Defendants also challenge whether Plaintiffs adequately pled any material misrepresentations or pled any false or misleading statements or actionable business practices under the securities laws.  To evaluate all of these contentions, requires a review of Plaintiffs' specific allegations on each element of their securities claims under their theories of liability and the alleged role of each individual defendant in ASG's, SPP's and PHS's statements and conduct impacting ASG's financial condition.

### Materiality

An element common to all of Plaintiffs' claims is materiality.  "[T]o fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'"  Basic Inc., 485 U.S. at 231-32.  The Court deems it noteworthy that the Supreme Court referred to information "such as earnings forecasts or projections" as "contingent or speculative information."  Id. at 232 n.9.  The Supreme Court, however, did not decide that issue.  Id.

In its opinion in Bridgestone, the Sixth Circuit noted that at the motion to dismiss stage, omissions should be considered material unless the omitted information was so "obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance."  Bridgestone, 399 F.3d at 681 (quotation omitted); see also Ganino v. Citizens Utilities Co., 228 F.3d 154, 162 (2d Cir. 2000) (quoting Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985)); Arber v. Essex Wire Corp., 490 F.2d 414, 418 (6th Cir. 1974) (The test for materiality is "whether a reasonable man would have attached importance to the undisclosed facts in determining his choice of action in the particular transaction in question.").

53

The materiality requirement does not require that the defendant communicated the misrepresentation directly to the plaintiff. In re Kidder Peabody Sec. Litig., 10 F. Supp. 2d 398,407 (S.D.N.Y. 1998). Unless written misrepresentations are material, such misrepresentations are not actionable. Radol v. Thomas, 772 F.2d 244, 252 (6th Cir.1985).

On this element, in its periodic reports to the SEC, ASG acknowledged and a market analyst reported that ASG's gross margins were the primary metric to evaluate ASG's business performance, including SPP's performance. Id. at ¶ 37. In its 2005 Report on Form 10-K, AGS stated that "[a] material weakness is a significant deficiency, or combination of significant deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected." Id. at ¶ 286. Under the circumstances here, the Court concludes that misrepresentations or omissions about SPP's and/or PHS's business practices that create or cause adverse financial impact for ASG, affecting ASG's gross margin to a significant degree satisfy the materiality requirement under Rule 10(b) precedents.

For the remaining analysis, the Court addresses first Plaintiffs' allegations of the Defendants' material misrepresentations and omissions about ASG's financial condition and SPP's and PHS's practices that adversely impacted ASG's costs.

### a. Plaintiffs' Misrepresentation Claims

As to these claims, Defendants argue that Plaintiffs's amended complaint does not identify a single false statement and also challenge the following allegations in the Plaintiffs' amended complaint as conclusory. (Docket Entry No. 69, Defendants' Memorandum at p 43 citing ¶¶ 7, 58, 75, 132, 142, and 330-33 of the Plaintiffs' Amended Complaint). Defendants also contend that the

54

allegations in the following paragraphs of Plaintiffs' Amended Complaint are forward-looking statements that are protected by PSLRA's safe harbor provisions. Id. at pp. 44 and 46, listing ¶¶ 113-17, 119-26, 148-49, 151-54, 156-57, 159-161, 164, 168, 171, 210-13, 215, and 217.

In their response in opposition to the Defendants' motion to dismiss, Plaintiffs identify the Defendants' allegedly false statements in their amended complaint as set forth in the following paragraphs ¶¶ 18, 22-23, 132, 147, 194, 197, 311-15, 328 and 334. Plaintiffs also cite the Defendants' false or misleading statements as reflecting the followings categories that are described in their amended complaint:

> (1) ASG[]'s quarterly and annual financial statements, along with various statements made in press releases and on conference calls describing those results (¶¶ 130-173, 232-324);
>
> (2) Statements regarding the reliability of ASG[]'s financial statements and the system of internal controls in place at ASG[] and its subsidiaries, including the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley Act" or "SOX"), 15 U.S.C. ¶¶ 201, et seq.. certifications made by ASG[], Catalano and Taylor (¶¶ 174-191, 285-292);
>
> (3) Statements regarding ASG[]'s accounting policies and its purported compliance with those policies (¶¶ 192-197);
>
> (4) Statements regarding ASG[]'s compliance with the terms of its government contracts, and the laws and regulations governing the performance of its obligations under those contracts (¶¶ 198-208); and
>
> (5) Statements regarding ASG[]'s exposure to medical malpractice claims (¶¶ 209-219).

(Docket Entry No. 73, Plaintiffs' Memorandum at pp. 5-6). Plaintiffs contend that the Defendants are tied to these statements in ¶¶ 22-23, 28, 55, 58, 62-63, 65, 311, and 314 of their amended complaint. Id. at p. 42.

In reply, the Defendants contend that many of Plaintiffs' citations of their challenged statements lack specificity as to which particular statement is false and most of these paragraphs

55

contain statements that are mixed with forward looking statements that are protected as a matter of law.

As set forth below, several of the statements in the paragraphs cited by the Plaintiffs for this section are general and conclusory in nature and refer to other unspecified statements in other unspecified paragraphs. As examples, paragraphs 22 and 23 are general descriptions of Hartman's and Bryson's position and duties. Paragraph 132 asserts that all of the defendants participated in the "making of the statements contained herein" and cites Hartman's and Bryson's responsibilities to oversee and prepare SPP's financial statements. Paragraph 147 refers to statements made during a telephone conference call. Paragraph 194 refers to statements about ASG's and SPP's accounting policies and Catalano's and Taylor's signatures on SEC filings as well as Hartman's and Bryson's responsibilities for SPP's compliance with ASG's accounting policies. Paragraph 197 refers generally to ASG's SEC filings signed by Catalano and Taylor and the responsibilities of Hartman and Bryson. Paragraphs 311 through 315 describe ASG's monthly meetings to discuss budgets and planning and the attendance of Catalano, Hartman and Taylor.

The Court fails to understand these conclusory references as stating specific misrepresentations or misleading statements. To be sure, some of these paragraphs refer to other statements in the amended complaint in unspecified paragraphs, but the Court is uncertain as to which specific statements Plaintiffs refer. Plaintiffs fail to analyze which part of these referenced statements contains hard information or protected soft information that could be converted into actionable statements. The Court cannot simply surmise the Plaintiffs' rationale on these issues. The Court therefore will address only the portions of the paragraphs in Plaintiffs' amended complaint that Plaintiffs cited to **and** which Plaintiffs supplied emphasis to portions of these

paragraphs or quoted statements of a defendant.

**(1) ASG[]'s quarterly and annual financial statements,**
**(¶¶130-173, 232-324)**

Plaintiffs allege that due to ASG's restatement and the changes regarding five years of

ASG's operation, the Defendants have admitted that during the Class Period, all of ASG's prior

financial statements and SEC filings are false and misleading for every quarter for five years. In

its restatement, ASG admitted that SPP had materially overstated its net income by at least $2.1

million, overcharged customers by at least $3.6 million and undercharged others from whom it

could no longer collect by at least $5.9 million. Plaintiffs also assert false and misleading

statements, based upon conflicts between the Defendants' statements about SPP's and PHS's

improved management to control costs and published reports about PHS's and SPP's actual

practices. Id. at ¶¶ 174-191 and 285-292. Plaintiffs allege the actual impact of SPP's practices

was greater than disclosed because ASG based these estimates on only 30% of SPP's sales and

excluded SPP's sales to PHS. Id. at ¶¶ 222, 229. In addition, Plaintiff refer to ASG's statement

about its "2004 Guidance" that appears to be from a SEC filing: "Pre-tax income from continuing

and discontinued operation is expected to be approximately $22.8 million in 2004 . . . ." Id. ¶ 152.

In its 2003 Form 10-K report, ASG also represented that:

> Management establishes reserves for the estimated losses that will be incurred
> under these insurance policies using internal and external evaluations of the merits
> of the individual claims, analysis of claim history and the estimated reserves
> assigned by the Company's third-party administrator. . . . **The Company is not**
> **aware of any material unasserted claims and, based on its past experience,**
> **would not anticipate that potential future claims would have a material**
> **adverse effect on its consolidated financial position or results of operations**.
> Any adjustments resulting from the review are reflected in current earnings.

Id. at ¶ 211 (emphasis added). ASG repeated these statements in its Form 10-Q Report issued on

57

May 10, 2004, August 9, 2004, November 9, 2004, and March 14, 2005. Id. at ¶ 212.

Plaintiffs also cite a chart of ASG's reported reserves for medical claims liability. Id. at ¶ 213. After *The New York Times* articles and legal actions, ASG raised its reserves for malpractice claims to more than $6 million. Id. at ¶ 94. Thus, Plaintiffs allege false representations in ASG's statements about its exposure to legal claims.

The controlling issue is whether these cited representations involve "soft" or "hard " information." Bridgestone, 399 F.3d at 669; accord Zaluski v. United American Healthcare Corp., 527 F.3d 564 (6th Cir. 2008). "Hard information is typically historical information or other information that is objectively verifiable. Such information is to be contrasted with 'soft' information which includes predictions and matters of opinion and are not actionable." In re Sofamor Danek Group, Inc., 123 F.3d 394, 401 (6th Cir. 1997). "The failure to disclose soft information is actionable only if it is virtually as certain as hard information." Bridgestone, 399 F.3d at 669 (quotation omitted). "Hard information is typically historical information or other factual information that is objectively verifiable. (internal quotations omitted). . . . 'Soft information,' on the other hand, includes 'predictions and matter of opinions.'" Id. (internal quotations omitted). Under the PSLRA, safe harbor protection is available for a firm's statements that are "defendants' projections, statement of plans and objectives, and estimates of future economic performance" 15 U.S.C. § 78u-5(c)(1), but this statutory protection can be overcome 'if the statement is material; if the defendant had actual knowledge that it was false or misleading; and if the statement was not identified as a forward-looking or lacked meaningful cautionary statements." Helwig, 251 F.3d at 547-48, abrogated on other grounds by Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 127 S.Ct. 2499, 2510 (2007).

Defendants cite paragraphs 113-17, 119-26, 148-49, 151-54, 156-57, 159-61, 164, 168,

58

171, 210-13, 215 and 217 of the Plaintiffs' Amended Complaint as reflecting projections of ASG's revenues, income, earnings per share, and other financial items such as medical claims liability reserves, that are covered by forward-looking statements safe harbor of the PSLRA. 15 U.S.C. 78u-5(i)(1)(A). As to the other ¶¶ 130 through 173 reciting figures and statements from ASG financial reports and SEC filings, upon review and with certain exceptions, the Court agrees that these statements are for the most part projections of future earnings and projected costs and are not actionable.

To the extent that some "hard facts" are included in these corporate statements, Plaintiffs contend that the extent of ASG's restatement and any future restatements cannot be decided on a motion to dismiss, citing In re Envoy Corp Securities Litig. 133 F. Supp. 2d 647, 662 (M.D. Tenn. 2001) ("the district court should decide the issue of materiality only if the alleged misrepresentations are so clearly and obviously unimportant that reasonable minds could not differ in their answers to the question") (quoting Semerenko v. Cendant Corp., 223 F.3d 165, (3d Cir. 2000)). Yet, under subsequent Sixth Circuit precedent, the fact of restatement involving millions of dollars alone does not render the original statement of those finances to be actionable nor to meet the requisite scienter as a matter of law. PR Diamonds, 364 F.3d at 686 (a corporate restatement that corrects millions of dollars in inaccuracies is not material). Consistent with PR Diamonds, the effect of ASG's restatement depends upon its "type and size" and must be evaluated in the totality of the circumstances in Plaintiffs' other allegations that are discussed at length infra. Id. In sum, under PR Diamonds, ASG's restatement alone does not provide an actionable claim for misrepresentations based solely on ASG's prior statements of its finances.

As to ASG's statements about its future exposure and its subsequent increase in reserves for PHS's medical claims, after The New York Times' articles, ASG increased its reserves for

59

malpractice claims by $6.1 million. Id. at ¶ 94. Statements about medical reserves are forward looking statements and are protected by the PSLRA. In re Kindred Healthcare Inc. Securities Litig., 299 F. Supp. 2d 724, 738 (W.D. Ky. 2004) ("The amount [a company] keeps in reserves to cover liability claims is necessarily a prediction about its future claims experience . . . . Assertions about the adequacy of [defendant's] reserves could only be verified when liability claims were actually filed, litigated to conclusion, or settled. It would seem rather beyond argument that such projections about the company's future economic health are forward-looking within the meaning of the PSLRA.")[8].

Defendants correctly note that ASG warned investors during the Class Period of risk factors that might cause actual malpractice expenses to exceed reserves. (Docket Entry No. 70, Appendix 4 at pp. 7-8; Appendix 2 at pp. 10-11). Such warnings render any projections inactionable as a matter of law. See Miller v. Champion Enter., Inc., 346 F.3d 660, 678 (6th Cir. 2003) (forward-looking statements accompanied by meaningful cautionary language are protected by PSLRA's safe harbor provisions). Moreover, "[t]he mere fact that [a company] increased its reserves for doubtful accounts in [one period] does not, by itself, call into question the accuracy of the [earlier period reserves]." In re Sprint Corp. Sec. Litig., 232 F. Supp. 2d 1193, 1227 (D. Kan. 2002). "[T]he failure to establish adequate reserves [] is generally not sufficient to establish securities fraud." In re E.Spire Commc'ns, Inc. Sec. Litig., 12 7 F. Supp. 2d 734, 748 (D. Md. 2001).

The Court concludes that as a matter of law, Plaintiffs' claims based upon the Defendants' statements in ¶¶ 130-173 and 232-324 are not actionable.

---

[8] In light of Bridgestone, this increase in reserves must be revisited in the analysis of Plaintiffs' omissions claims.

### (2) ASG's Press Releases and Defendants'
### Catalano and Taylor's Published Statements

Plaintiffs apply the same rationale to the Defendants' other statements, namely that because of ASG's restatement of five years of its finances, any prior press statements about ASG's finances are false or misleading. Plaintiffs cited the following specific statements about ASG's financial condition in their first amended complaint as misrepresentations or misleading statements that occurred during conference calls and in press releases:

- In a March 18, 2002 press release, Catalano told investors that ASG had "developed a corrective cause of action focused on a return to predictable financial results". (Docket Entry No. 60, Amended Complaint at ¶ 34);

- On that same date, Catalano stated that "debt levels had been significant reduced." Id. at ¶ 112;

- On April 22, 2004 Catalano alleged commented: "The initiatives we have implemented, coupled with an emphasis on strong fiscal discipline, are producing results. Our improved performance in the first quarter reflects the actions we are taking. Our management team is intensely focused, and our mission remains clear." Id. at ¶ 114

- February 22, 2004 conference call during which Taylor told investors ASG's costs were "$1.6 to $1.7 million on an average day." Id. at ¶ 149;

- "{W]e're giving guidance that says we can take total gross margins as a company up another step from the 6.6% that we did for full year this year to 6.9% next year." Id. ¶ 149;

- "[W]e are increasing our 2004 guidance for total revenues to 658 million for the year . . . ." Id. ¶ 153;

- In the April 27, 2004 conference call, Defendant Taylor's stated ASG's purported ability to cut expenses for its clients:"Yes, we do think that one of the things we're bringing to our clients this year, and I mentioned it I think on the year-end call, is that we think we're going to be able to mitigate to some degree for our clients their level of increase in cost of our services and so that - we are seeing some of that based in our mix of costs and that would be our current hopes and anticipation." Id. at ¶ 154

- In a July 27, 2004 conference call, Taylor stated, inter alia, "I would anticipate

something in 7.3 to 7.5 [%] range for the Company in the second half of the year. It is coming primarily from repricing of contracts.... So we do anticipate we will see that improved performance in the second half of this year. And that is really what has been contemplated all along. Maybe a little better than we thought initially as we started the year are our expectations for the second half at this point" Id. ¶ 157 ;

- In a press release, ASG reported: The Company is maintaining most aspects of its previous guidance for 2004 . . . ." Id. ¶ 160;

- The October 26, 2004 conference call included Taylor's statement that "[Quite frankly, SPP has been a significant part of generating new business revenue growth on a year-to-date basis" Id. ¶ 161

- In a February 7, 2005 press release, ASG stated: "The Company has significantly reduced the volatility of its contract portfolio over the last several years . . . ." Id. ¶ 164 ; and

- During a July 25, 2005 conference call, Taylor is quoted as stating "Anton, we do expect the second half to see an increase in that EBITDA margin, as you pointed out, in our guidance. The 4.5% [margin] or so for the first half certainly was a solid start for the year   All along we had expected to see an improvement in that in the second half. That improvement primarily is going to be driven by the gross margin percentage improving in the second half.  Once again that was in line with our initial expectations for what the year would hold." So it is really going to be a gross margin improvement in our expectations that gets us to that higher level of EBITDA margin. .... Certainly as we sit here in July, I mean, we are comfortable with these guidance figures for the full year.  So there is nothing at this point that would change that view." Id. ¶ 171.

Insofar as the February 24, 2004, April 27, 2004 and October 26, 2004 conference calls and the July 2, 2004 and October 25, 2004 press releases involve statements on ASG's stated guidance, Id. at ¶¶ 153, 154, 156, 157, 160, 161), the Court concludes that with exceptions noted below, these statements about guidance and other quoted projections and opinions about ASG's expectations of its future profits are not actionable as soft information.

The first exception is ASG's October 25, 2004 press release on ASG's financial results for the third quarter ending for September 30, 2004, when Catalano described ASG's cost increases:

We are disappointed in the additional reserve necessary to cover losses under our

62

Maryland contract through its expiration on June 30, 2005. In the meantime, the **Company will faithfully adhere to the terms of our contract and continue our commitment to provide quality healthcare to our patients.** We remain confident in the long-term prospects of the Company. The rest of our contract portfolio continues to produce expected financial results, cash balances are increasing and **we are debt free as of the end of the quarter.**

Id. at ¶ 159. As discussed infra, this opinion about being in compliance with contracts is capable of verification by objective evidence of SPP's and PHS's practices.

Another exception is in its February 7, 2005, press release, wherein ASG stated:

This ongoing process of adjusting the Company's contract portfolio has resulted in 88% of the Company's healthcare contracts and all pharmacy contracts has of December 31, 2004, representing 74% of Total Revenues in the fourth quarter, **have structures that limit the Company's exposure to increases in hospitalization and other off-site medical expenses."**

Id. at ¶ 164.

The third exception is the April 27, 2005 conference call with securities analysts when securities analysts asked about the ASG's ability to maintain its gross margins and expenses and Taylor responded as follows:

Anton Hie - Jefferies & Co. - Analyst

Okay. How about the current quarter month-end here, do we think we will see the margins holding steady here, now that some of those utilization issues that caused the fourth-quarter spike are behind us?

Mike Taylor - America Service Group - CFO

Well, we are always subject to that volatility, and that is kind of the point on those contracts. **Certainly at this point, Anton, things are tracking along with our expectations. That is why we've maintained the guidance that we have for the full year. So early into the second quarter, we don't see anything that changes that impression.**

Id. (emphasis added).

Here, ASG's restatement reflects ASG's admission that its internal controls "were not

63

designed or operating effectively to reduce to remote the likelihood that material errors [in ASG's consolidated financial statements would be prevented or detected in a timely manner." Id. at ¶ 80. Defendants contend that the cumulative effect or bottom line effect of all of these alleged wrongful practices is relatively small. Yet, the common theme that emerges from Plaintiffs' allegations is that the key to ASG's profitability is ASG's control of its subsidiaries' costs and the ratio of ASG's healthcare costs to its total revenue. Plaintiffs allege that a market analyst advised investors that ASG's medical expense ratio, *i.e.*, healthcare expenses as a percentage of revenue, is the critical factor in ASG's success and warned investors that "subtle changes in this ratio can have a significant impact on the company's profitability." Id. at ¶ 37.

Under PR Diamonds, a company's "type and size" are important in evaluating financial errors and related statements. PR Diamonds, 364 F.3d at 686. From a management perspective, ASG, SPP and PHS are small companies with a few key managers that includes at least one interlocking officer, Hartman who served as SPP's chief executive officer, PHS's chief executive officer and ASG's executive vice-president. Although ASG has contracts nationwide, ASG's, SPP's and PHS's policies are set in Brentwood and Franklin, Tennessee. ASG and PHS operated out of the same building in Brentwood. (Docket Entry No. 60, Amended Complaint at ¶¶ 17 and 19). SPP's headquarters were just nine miles away in Franklin. Id. at ¶ 18. Management of ASG and its subsidiaries frequently met with one another (including the individual defendants named here) to conduct detailed, line-by-line reviews of costs and operations at each facility. Id. at ¶¶ 310-316. SPP's accounting errors are based allegedly upon SPP's well-known defective computer program for pricing and SPP's manual. Governmental inquiries revealed that PHS's activities were a product of corporate management to reduce PHS's costs.

In these circumstances, with all favorable inferences to the Plaintiffs' factual allegations as

64

required for this type of motion, the Court concludes that a balancing of inferences results in a

reasonable and strong inference for these statements of ASG, Catalano and Taylor about ASG's

costs, and that these statements involve material facts and are actionable as securities claims.

> **Statements and certification by ASG, Catalano and Taylor regarding the reliability of ASG's system of internal controls in place at ASG and its subsidiaries, including the Sarbanes-Oxley Act of 2002 (¶¶ 174-191, 285-292)**

For their next category of false and misleading statements, Plaintiffs cite Catalano's and

Taylor's Sarbanes-Oxley certifications during the Class Period falsely assuring investors that

Catalano and Taylor had personally designed, checked, and monitored ASG's and its subsidiaries'

systems of internal controls that would reasonably design to uncovered any accounting

manipulations. As pertinent here, these certifications provided as follows:

> **The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e) for the registrant and have:**
>
> a) **Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision,** to ensure that material information relating to the registrant, **including its consolidated subsidiaries**, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
> b) **Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report** our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
> c) **Disclosed in this report any changes in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; . . . .**

Id. at ¶ 176 (emphasis added). Catalano and Taylor signed such alleged false certifications in

2002, 2003, 2004 and 2005. Id. at ¶¶ 177, 178.

65

As to the Sarbanes-Oxley certifications, courts have declined to treat corporate officers' signature for such certifications, as a per se violation where accounting errors or mistakes are revealed by a subsequent audit. Ley v. Visteon Corp., 543 F.3d 801, 812 (6th Cir. 2008) ("We agree with the Eleventh Circuit that a Sarbanes-Oxley certification is only probative if the person signing the certification was severely reckless in certifying the accuracy of the financial statements") (citation omitted); see also In re PhyCor Corp. Sec. Litig., No. 3:98-0834, slip op. at 6 (M.D. Tenn. Feb. 17, 2000) (upholding §10(b)(5) claims where, at time defendants made false positive statements about PhyCor Corporation's financial condition at times when controls were known to be inadequate).

As to the Sarbanes-Oxley certifications, Catalano and Taylor certified that their personal responsibilities on these control measures included ASG's "consolidated subsidiaries." Id. at 60. Every quarter, Catalano and Taylor specifically certified that they had each personally reviewed the controls at ASG "including its consolidated subsidiaries" during the past 90 days, and found them to be both reasonably adequate. Id. at ¶¶ 176-178. Here, ASG Catalano, chief executive officer and Taylor, chief financial officer, specifically undertook responsibility for designing, maintaining, and certifying the adequacy of the internal controls at PHS that shares offices with ASG and SPP that is nine miles away. Id. at ¶¶ 18, 175-178. Catalano and Taylor were the signatories. Plaintiffs allege specific facts that these Defendants participated in fiscal meetings for SPP and PHS. As to SPP, the structural deficiency in SPP's computer system, Plaintiffs specifically allege a former SPP officer asserts that Catalano and Taylor knew of this computer's structural deficiencies that could not compute customer rebates required by SPP's contracts. Upon these specific factual allegations, Plaintiffs' certification claims against Catalano and Taylor are actionable.

66

As to Defendants Hartman and Bryson, Plaintiffs' amended complaint "is devoid of a single specific factual allegation suggesting that either [of them] played any role in drafting, reviewing, or approving any of these certifications, that Plaintiffs contend were false or misleading." (Docket Entry No. 69, Defendants' Memorandum at p. 43). If the Plaintiffs' claims were limited to misrepresentations, the Court would agree that these Defendants should be dismissed. Yet, Plaintiffs also assert a theory of liability, discussed in more detail infra, that all of the Defendants engaged in a scheme or plan to inflate the value of ASG stock and under that theory, the defendants are alleged to be intimately involved. Hartman and Bryson prepared SPP's financial reports for ASG. Hartman and Bryson allegedly personally made the decisions whether to give credits for returned drugs were approved directly by Hartman or Bryson. Id. at ¶ 55. Bryson supervised quarterly inventories at SPP. Id. at ¶ 56. Plaintiffs allege, through direct witness testimony, that Bryson personally directed SPP's illegal importing of drugs from Canada. Id. at ¶ 65.

With Plaintiffs' alternative theories of liability, the Court concludes that these statements are actionable as to Hartman and Bryson only as evidence that the Defendants engaged in a manipulative scheme in "connection with" ASG's sales of its securities.

### b. Plaintiffs' Omissions Claims

The flip side of Plaintiff's misrepresentation claims are Plaintiffs' omissions claims that the Defendants failed to disclose ASG's actual business practices and costs that were understated due to SPP's and PHS's practices that breached their contracts with governmental entities. Two related theories of liability are Plaintiffs' theories of "Fraud on the Market" and the Defendants' scheme or device in "connection with" the sales of ASG's securities theories that are also based omissions about SPP's and PHS's unlawful practices.

These omissions are alleged to be clear and material because the published news reports and legal actions disclosing SPP's and PHS's business practices caused ASG's restatement of its SEC filings and financial statements for five years. Plaintiffs allege that ASG's accurate cost data was omitted from ASG's press releases, Catalano's and Taylor's statements to investors, and market analysts during conference calls. In addition, Plaintiffs contend that SPP's and PHS's breaches of their contracts evince widespread practices that the Defendants' knew about or were reckless in not knowing of these practices that were critical to ASG's control of its costs and to ASG's profitability.

In response, Defendants contend that the limited number of instances of PHS's alleged breaches of its contracts lack the required numerosity to find material omissions or to evince an actionable scheme to defraud investors. (Docket Entry No. 78, Defendants' Reply at pp. 2, 7).

As a threshold issue, to violate Rule 10b-5 for omissions or nondisclosures, the defendant must have an affirmative duty to disclose the material fact because "[s]ilence without a duty to disclose, is not misleading under Rule 10b-5". Basic Inc., 485 U.S. at 239 nns. 17, 18. The materiality of the information does not create a duty to disclose. Sofamor Danek, 123 F.3d at 402. "Ordinarily, at least, a company is under no obligation to disclose the details of its merchandising practices" Sofamor Danek, 123 F.3d at 400. Yet, "once a company chooses to speak, it must 'provide complete and non-misleading information with respect to subjects on which it undertakes to speak." Zaluski, 527 F.3d at 572 (quoting Rubin v. Schottenstein, 143 F.3d 263, 268 (6th Cir. 1998). Moreover, where a company's corporate officers "elected to make statements such as the statement regarding. . . . 'objective data,' the company is required to qualify that representation with known information undermining (or seemingly undermining) the claim." Bridgestone, 399 F.3d at 673. The concealment of such data must be "known exclusively to the Defendants." Id. at

68

676.

Here, ASG had a duty to disclose material facts because ASG had to file SEC reports on its business. ASG, Catalano and Taylor also owed a duty to disclose material facts when they elected to make other statements in press releases and conference calls about ASG's healthcare revenues and costs. As ASG's restatement reflects, ASG's expenses were misstated every quarter during the five year period. ASG's reported cost margins - one of the most important metrics to investors - were unreliable during the entire Class Period. Id. at ¶¶ 97, 134-135, 225-228, 236-245. In its restatement, ASG admitted that SPP had overstated its net income by at least $2.1 million, overcharged customers by at least $3.6 million, and undercharged others from whom it could no longer collect by at least $5.9 million. Id. at ¶ 222. The cost of investigating and correcting these practices was $7.7 million that is twice ASG's net income for the entire 2005 fiscal year. Id. at ¶ 74.

As to the materiality of these nondisclosures, the Defendants cite the cumulative effect of the challenged practices on ASG's earnings of $347,000 with increased tax liability of $355,000. As stated earlier, with the exclusion of SPP's transactions with PHS and the sampling of only 30% transactions, the figures stated by the Defendants may be understated. ASG's profitability depended on ASG's control of its subsidiaries' costs. ASG admitted that the ratio of ASG's healthcare costs to its total revenue was the critical metric for its business. Significantly, Plaintiffs allege that a market analyst advised investors that "subtle changes in this ratio can have a significant impact on the company's profitability." (Docket Entry No. 60, Amended Complaint at ¶ 37). Moreover, ASG's restatement admittedly was based only on a small sample of transactions (only 30% of SPP"s Class Period revenues). ASG's restatement allegedly excluded analysis of affected inter company earnings to achieve better results or to understate its actual

69

losses or the scope of SPP's misrepresentations of its finances.  Id. at ¶¶ 63-64.  ASG's

restatement conceded that additional restatements could be required due to SPP's accounting

manipulations.  Id. ¶¶ 229-23.  As a result, a reasonable and strong inference arises that ASG

understated the true impact of SPP's accounting practices.  There is not a competing inference to

explain these omissions about ASG's business practices.

      The Court concludes that the Defendants' cited omissions of SPP's and PHS's actual

practices and their cost effects on ASG's financial condition involve material facts and are

actionable.

### c. The "In Connection With" Theory

      The next related theory is that SPP's and PHS's business practices were a scheme that

influenced the investors' purchases of ASG's securities and ASG did not disclose those practices

to investors.  Section 10(b) and Rule 10b-5 Section 10(b) extend to prohibit material omissions

where there is "the commission of a manipulative act in connection with the sales of securities."

Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 177 (1994).

In SEC v. Zandford, 535 U.S. 813, 819, 825 (2002) , an action under § 10(b) and Rule 10b-5, the

Court unanimously adopted the SEC's "broad reading of the phrase 'in connection with the

purchase or sale of any security,'" and held that such "connection" occurs if the "fraudulent

scheme" and a securities transaction "coincide."  Earlier in Affiliated Ute Citizens v. United

States, 406 U.S. 128, 153 (1975), the Supreme Court deemed the "first and third subparagraphs

[of Rule 10b-5]" to include a securities claim based upon "a 'course of business' or a 'device,

scheme or artifice' that operated as a fraud [where] the defendants devised a **plan** and induced

[stockholders] to dispose of their shares without disclosing to them material facts."  (emphasis

added).

To be sure, in <u>Sante Fe Industries, Inc. v. Green</u>, 430 U.S. 462, 477 (1977), the Supreme

Court stated that Section 10 (b) did not encompass "instances of corporate mismanagement."

Rather, "Section 10(b)'s general protection of practices deemed by the SEC to be manipulative 'in

this technical sense of artificially affecting market activity in order to mislead investors is fully

consistent with the fundamental purpose of the 1934 Act to substitute a philosophy of full

disclosure for the philosophy of caveat emptor. . . .'" <u>Id.</u> at 476-77 (quoting <u>Affiliated Ute</u>, 406

U.S. at 151 (quoting <u>SEC v. Capital Gains Research Bureau</u>, 375 U.S. 180, 186 (1963))). "No

doubt Congress meant to prohibit the full range of ingenious devices that might be used to

manipulate securities prices." <u>Sante Fe Industries</u>, 430 U.S. at 477.

    <u>Zandford</u> also cautioned that "our analysis does not transform every breach of duty into a

federal securities violation." 535 U.S. at 825 n4. <u>In Stoneridge Investment Partners, LLC v.</u>

<u>Scientific-Atlanta, Inc.</u>, 128 S.Ct. 761, 766 (2008), the Supreme Court applied the <u>Zandford</u>

standard and rejected securities claims premised on alleged losses after purchasing common

stock and "sought to impose liability on entities who, acting both as customers and suppliers,

agreed to arrangements that allowed the investors' company to mislead its auditor and issue a

misleading financial statement affecting the stock price. We conclude the implied right of action

does not reach the customer/supplier companies because the investors did not rely upon their

statements or representations." Moreover, "the text of the 1934 Act does not in itself reach to

those who aid and abet a § 10(b) violation." <u>Central Bank</u>, 511 U.S. at 177.

    Under this theory, the challenged corporate practices should be "statistically significant",

<u>In re Carter-Wallace, Inc.</u> 220 F.3d 38, 41 (2d Cir. 1998) or "widespread," as "anecdotal"

occurrences do not evince an unlawful business scheme in connection with the sales of securities.

<u>In re Spectrum Brands, Inc. Sec. Litig.</u>, 461 F. Supp. 2d 1297, 1310-11 (N.D. Ga. 2006). Yet, in

71

this Circuit, less frequent omissions, such as omissions of governmental scrutiny and legal actions over a company's practice of selling defective products, were held actionable in Bridgestone, 399 F.3d at 670-80.

This Court has found that "plaintiffs' allegations regarding Columbia's failure to disclose that it engaged in improper business practices" is an actionable omission under Rule 10b-5. Morse v. McWherter, 200 F. Supp. 2d 853, 861 (M.D. Tenn. 1998) vacated on other grounds 290 F.3d 795 (6th Cir. 2000). See also In re Rent-Way Sec. Litig., 209 F.Supp.2d 493, 508-09, 516-18 (W.D. Pa. 2002) (upholding claims based on concealment of defects in internal accounting systems and controls).

The core of Plaintiffs' "in connection with" claims are ASG's, SPP's and PHS's business practices that caused ASG's financial condition and ASG's officers' statements about ASG'S financial condition to be false and misleading. In summary, the individual practices are:

1. SPP's computer practices that manipulated ASG's costs and revenues by delaying entry of falling prices rebates and discounts to customers so as to change higher price and to avoid credits to its customers.

2. PHS's practice of denying patients off-site hospitalization and higher medications and shifting staff personnel to reduce ASG's violations of PHS's contracts.

3. ASG's practice of terminating complaining employees and quick settlements of legal actions to avoid disclosures of PHS's practices as well as various government investigations of PHS.

4. ASG's lack of internal controls over SPP's and PHS's practices despite ASG's key executive officers' assurances to investors of such controls in public statements and ASG financial statements and certifications.

For these practices, Plaintiffs' allegations are based upon ASG's restatement and evidence from former officers and employees of ASG, SPP and PHS about these entities' practices.

On whether the defendants' practices nos. 1 and 2 were widespread, the Court deems

72

probative the remarks of state and local governments about the results of their inquiries into

PHS's practices.

- **In late 2000**, government investigators looking into a string of inmate deaths in upstate **New York noticed a pattern of inadequate healthcare under PHS' direction, including, "low-level employees [who] were doing work normally done by better-credentialed people" and nurses without proper qualifications or working on suspended licenses, "making medical decisions and pronouncing patients dead." "Our sense was that what we were dealing with was not clinical problems but business practices," said James E. Lawrence, the New York State Commission of Correction's director of operations.**

- **In 2001 in Broward County, Florida, three state court judges ordered PHS to stop withholding expensive psychiatric drugs from inmates after they witnessed a parade of inmates showing in the court incoherent. "My impression was that it was money," Judge Susan Lebow told The New York Times. "The doctors were under corporate direction to not continue the medications."**

- Judge Lebow's concerns were eerily similar to those that had been raised in 2000 by five juvenile court judges in New York who had repeatedly taken PHS to task for failure to provide juvenile inmates with proper medication. Brooklyn Family Court Judge Philip C. Segal held the company in contempt for failing to give HIV medication to a teenage inmate. Bronx Judge Harold J. Lynch ordered a teenage girl to be taken out of PHS' care when she tried to commit suicide after her psychiatric medication was inexplicably discontinued. After another 14-year old girl suffering from bipolar disorder whose medication had been similarly discontinued appeared in Judge Paula J. Hepner's courtroom, the jurist told city lawyers that **the incident "is not just a single case. It's many cases."**

- And following one inmate's death **in 2001, the New York State Commission of Corrections denounced PHS as "reckless and unprincipled in its corporate pursuits, irrespective of patient care."**

Id. at ¶ 144 (emphasis added).

As noted earlier, the market recognized that only small percentage increases in ASG' gross

margin could adversely impact ASG's profitability. After the New York Times articles of

February and March, 2005 about PHS's practices in the second half of 2005, ASG's third quarter

financial statements revealed its costs had risen to 99.7%, the highest level since 2001. Id. at ¶ 89. SPP's revenue dropped 18%. Id. at ¶ 91. ASG missed its guidance on net income by 83.5%; EBITDA fell by 42.5% and earnings per share by 74.5%. Id.

As to practice 3, Plaintiffs identify several legal actions against the Defendants for PHS's practices and ASG's increase of $6.1 million for future medical malpractice claims. Plaintiffs cite other legal actions by employees who were terminated for complaining about PHS's practices. Id. at ¶¶ 52 and 53. SPP's accounting practices were structurally defective as SPP's highly restrictive computer program for prices consistently did not record credits for rebates and discounts for SPP's customers. Plaintiffs also allege that SPP resold drugs from partially used "blister packs" without crediting customers for returns. Id. at ¶¶ 55, 56. Yet, these re-sales of returned drugs are not shown to violate SPP's individual customer agreements. Plaintiffs do not tie these resales to the accounting improprieties at SPP. Plaintiffs' allegation of Hartman's alleged reference to the sales as "recycling," id. ¶ 62, fails to raise a strong inference of scienter. However, SPP's extensive purchases of drugs from Canada also evinces a pattern and practice of corporate misconduct. SPP's circumvention of federal regulations by smuggling low-cost prescription medications into the United States from Canada is another unlawful practice to control ASG's costs and to meet ASG's market expectations for performance.

For the reasons stated above, the Court deems Plaintiffs sufficiently allege that PHS's and SPP's practices are widespread and systemic, as reflected in the extent of ASG's restatement and revised losses. The Court concludes that Plaintiffs' allegations demonstrate that nondisclosures of these practices constituted material omissions about ASG's actual practices, costs and gross margins during the class period and are actionable.

74

### d. Fraud on the Market

The "Fraud on the Market" theory of liability under Rule 10b-5 rests upon a presumption of reliance upon a showing of the Defendants' affirmative withholding of material facts affecting ASG's sale of securities. In <u>Affiliated Ute</u>, the Supreme Court considered securities fraud claims involving the sale of stocks by a corporation that was created under the Ute Partition Act, 25 U.S.C. §§ 677-677aa. This corporation was organized to manage the Ute tribes' oil, gas and mineral asserts. In the sale of the corporations' stock, certain individuals who were selling stock, withheld from investors information that there was not a method to determine the stock's true value. The Supreme Court stated as to the reliance factor that:

> Under the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision. . . [citations omitted]. This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact.

406 U.S. at 152-53. The rationale for presumption of reliance, in essence, is that it is impossible for the plaintiffs to show reliance upon facts there were not disclosed to them.

Subsequent decisions have clarified the <u>Affiliated Ute</u> presumption as limited to these circumstances in which there was an affirmative withholding of facts by a person under a duty to speak, i.e., where "the defendants . . . stand mute in the fact of a duty to disclose as did the defendants' in <u>Affiliate Ute</u>." <u>Kirkpatrick v. J.C. Bradford</u>, 827 F.2d 718, 722 (11th Cir. 1987). In <u>Kirkpatrick</u>, the <u>Affiliated Ute</u> presumption was held not to apply were "the allegations contend that the defendants undertook . . . to disclose relevant information . . . alleged to contain certain misstatements of facts and fail to contain other facts necessary to make the statements made, in light of the circumstances, not misleading." <u>Id.</u> at 722.

75

Here, given ASG's press releases and Catalano's and Taylor's public statements, these Defendants owed a duty to not withhold material facts about ASG's, SPP's and PHS's business from investors. To avoid undue repetition, the Court adopts its earlier stated rationale on Plaintiffs' omission for Plaintiffs' "in connection with" theories, to conclude that Plaintiffs' complaints states an actionable "fraud on the market" claim for the above cited omissions.

### 4. Plaintiffs' Scienter Allegations

To be sure, the ultimate issue on this motion is whether Plaintiffs' factual allegations present a strong inference of scienter. If the complaint fails to satisfy the scienter requirement, the Court must dismiss the plaintiffs complaint upon a motion of the defendant. 15 U.S.C. § 78u-4(b)(3). "[T]he Supreme Court has defined 'scienter' as a 'mental state embracing intent to deceive, manipulate or defraud.'" In re Comshare, 183 F.3d at 548. "Under current Sixth Circuit law, 'recklessness [also] satisfies the § 10(b)/Rule10b-5 scienter requirement.'" Id. Recklessness is "highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it." Id. at 550.

In Ley, the Sixth Circuit noted:

[These] factors . . . . while not exhaustive, are probative of scienter in securities fraud cases:

(1) insider trading at a suspicious time or in an unusual amount;

(2) divergence between internal reports and external statements on the same subject;

(3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information;

(4) evidence of bribery by a top company official;

76

(5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit;

(6) disregard of the most current factual information before making statements;

(7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication;

(8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and

(9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

. . . . . We find this list, while not exhaustive, at least helpful in guiding securities fraud pleading.

543 F.3d at 810 (citation omitted).

Of the actionable practices and conduct listed in Ley, the following are presented under Plaintiffs' factual allegations of scienter: "(1) insider trading at a suspicious time or in an unusual amount;" "(2) divergence between internal reports and external statements on the same subject;" "(5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit;" "(6) disregard of the most current factual information before making statements;" "(7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication;" and "(8) the self-interested motivation of defendants." Plaintiffs also assert that the Defendants' possessed the requisite motive and opportunity to intentionally commit these acts and to be reckless in their statements giving rise to Plaintiffs' claims.

### "[I]nsider trading at a suspicious time or in an unusual amount"

Prior to October 2003, Plaintiffs allege that Catalano had never sold any of his ASG stock, but he liquidated more than 90% of his stock in October and November 2003, after ASG told

77

investors that ASG's expense margins were under control and after ASG's stock price rose to $14.00 a share. Id. at ¶¶ 13, 19-32. Catalano received $5.2 million from his stock sales. Id. at ¶¶ 320, 321. In October and November 2003, Taylor first sold more than 90% of his ASG stock. Id. at ¶¶ 13, 19. These stock sales occurred after Taylor told investors that ASG's costs were under control. Id. Taylor received $842,897 from these stock sales. Id. at ¶¶ 320 and 321. Plaintiffs allege that SPP's and PHS's unlawful contract practices were implemented to inflate the value of ASG's stock so as to increase Catalano's and Taylor's profits on their sales of their stock options. Id. at ¶¶ 30-40, 92-98, 319-324. The Court deems the Plaintiffs' other allegations of insider trading to lack an adequate time to evaluate those trades for scienter purposes.

For the Catalano and Taylor trades, the Defendants cite the time disparity between these insider trades in 2003 to the disclosure of PHS's practices in February 27, 2005 as precluding any inference of scienter, citing In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1093-94 (9th Cir. 2002) (insider trading more than a year before the press release of alleged damaging news did not give rise to a strong inference of scienter); In re Kindred Healthcare, 299 F. Supp. 2d at 741 (stock sale eleven months before announcement of charge to earnings was not suspicious).

Yet, Plaintiffs allege that the timing of these trades was to maximize their profits before public disclosures of SPP's and PHS's improper practices. Plaintiffs' theory is that a reasonable and strong inference arises from the suspicious timing i.e. the date of the new cost control measures that ASG and these defendants enacted in April, 2002, supra at pp. 9-10, and the October and November 2003 insider trades of Catalano and Taylor. These insider trades occurred after improper cost control measures had been implemented to reduce ASG's costs and to inflate the value of ASG's stock. The cost controlling measures are the SPP's and PHS's deliberate practices that give rise to Plaintiffs' claims. These facts neutralize any favorable inference. In this

78

context, the Court concludes that Plaintiffs present a reasonable and strong inference of insider trading as to Catalano and Taylor.

<strong>"[D]ivergence between internal reports<br>and external statements on the same subject"</strong>

On the internal inconsistency, ASG cited the existence of its internal controls, but ASG's restatement found a lack of internal controls that caused SPP's revenues to be systematically inflated for SPP's failure to credit customers their share of rebates, discounts and return credits. An employee, a fulfillment manager who reported directly to Hartman and Bryson, allegedly relates that SPP deliberately took advantage of CIPCS's shortcomings to manipulate the timing of price changes - inputting rising prices into the system before customer invoices were sent, and delaying input of falling prices until after invoices issued at outdated higher prices had been generated. Id. at ¶¶ 55 and 60. CIPCS's inability to track more than one purchase price for any drug was allegedly well-known to the Defendants. E.g., ¶¶ 59-63, 185-191. The information contained in the CIPCS database also clearly reflected that customers were not receiving credits for returned drugs, despite the fact that SPP's warehouse was overloaded with returns and had no place to store them. Id. ¶ 61. SPP's manual demonstrates how pervasive and routine these practices were at SPP. ASG publicly touted its customized computer systems that permit ASG executives to monitor revenue and expense continually across the country. Id. at ¶¶ 26, 309. PR Diamonds cited approvingly of precedent that found a strong inference arising where the company "touted the individual Defendants' careful monitoring of the very areas in which Intrenet committed accounting violations." 364 F.3d at 688 (citation omitted). The Court reiterates its earlier conclusion that PHS's unlawful practices were widespread. The Court discerns an unfavorable inference from the Defendants' nondisclosure of SPP's and PHS's practices.

79

Thus, the Court concludes Plaintiffs' allegations create a strong inference of scienter to state a valid claim given the clear and significant inconsistencies between ASG's published statements of its internal costs control and ASG's management strong focus on those controls and the lack of such controls for SPP's and PHS's actual practices.

### "[E]xistence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit"

According to Plaintiffs, a highly critical report of an investigation into the death of a Schenectady County inmate was due to PHS' refusal to provide medication needed to treat the inmate's Parkinson's disease. *The New York Times* quoted the Schenectady county attorney, Chris Gardner: "We were going to terminate them for cause, [b]ut they approached us and we mutually agreed to terminate the relationship." Id. at ¶ 48. ASG also settled another action for a Florida inmate in September, 2005. Id. at ¶ 51. As stated earlier, ASG set aside $6.1 million in reserves for future medical malpractice claims. Plaintiffs also refer to SPP and PHS employees who were terminated or forced to resign when they complained of SPP's and PHS's practices. Id. at ¶¶ 52, 53. The Court concludes that Plaintiffs' allegations about this practice are actionable given the deliberate nature of the practice.

### "[D]isclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication"

Plaintiffs allege ASG's restatement disclosed only limited information about SPP's accounting impropriety by disclosing only the "net" or "cumulative" impact of the misconduct. ASG allegedly deliberately failed to provide complete restated quarterly financial statements that would have revealed the extent to which quarterly results had been manipulated by the Defendants' illegitimate accounting practices. Id. at ¶¶ 83-84, 229, 246-260. Plaintiffs allege

80

defendants did so in order to confuse investors about the impact of their fraud and to support their "net impact" argument in this action. In its restatement, ASG allegedly engaged in improperly "reclassifying" hundreds of millions of dollars in revenue during the Class Period. Id. ¶¶ 87, 246-260. These alleged acts allegedly destroyed the comparability of prior quarterly results, making it near impossible for all but the most sophisticated investors to unravel ASG's restatement and determine the extent to which investors had been misled. Id. at ¶¶ 87, 246-260

In the Sixth Circuit, misleading financial presentations that are intended to confuse rather than illuminate, can provide a strong inference of scienter. Bridgestone, 399 F.3d at 684. As to Defendants' suggestion that ASG's restatement treatment is legitimate given the approval of outside auditors, Plaintiffs note that these same auditors also approved ASG's prior financial statements for five years covered by ASG's restatement. In any event, this argument raises fact issues that cannot be resolved on a motion to dismiss. See e.g., Aldridge v. A.T. Cross Corp., 284 F.3d 72,83 (1st Cir. 2002) (auditors' failure to require restatement does not conclusively prove that financial statements complied with GAAP).

In this Court's view, despite the cost of $7.7 million in ASG's internal investigation, ASG sampled only 30% of SPP's transactions and excluded SPP's sales to PHS. ASG conceded the prospect of future restatements and future customer claims for rebates and credits. Coupled with the alleged accounting errors, the Court concludes that these circumstances support a reasonable and strong inference that ASG's restatement is misleading as to the full extent of SPP's practices and their impact on ASG's financial condition.

### Plaintiffs' other Scienter Contentions

To meet the scienter requirement, Plaintiffs' allegations must describe "multiple, obvious red flags." PR Diamonds, 364 F.3d at 687; In re Comshare, 183 F.3d at 553. In considering this

81

issue, the Court must consider the totality of circumstances pled in the complaint and "sift Plaintiffs' allegations individually and then aggregate the nuggets of inference they generate....." PR Diamonds, 364 F.3d at 684.

### ASG's Restatement

Again, the key to most of Plaintiffs' allegations and claims arise from the effect of ASG's restatement revealing differences from ASG's prior financial reports and the public statements of Defendants ASG, Catalano and Taylor. Yet, in the Sixth Circuit, "Plaintiffs' claim that a subsequent revelation of the falsehood of previous statement implies scienter lacks merit, since mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." In re Comshare, 183 F.3d at 553. Moreover, a company's restatements of its finances involving millions of dollars has been rejected as evincing scienter. PR Diamonds, 364 F.3d at 671. As to Plaintiffs' contention that ASG's restatement covered five years, "although Plaintiffs speculate that it is likely that Defendant knew of the GAAP violations because they occurred over a long period of time, claims of securities fraud cannot rest on speculation and conclusory allegations." In re Comshare, 183 F.3d at 553 (internal quotes omitted). Based upon PR Diamond and In re Comshare, the Court concludes that the restatement alone does not give rise to a strong inference of scienter.

### Sarbanes-Oxley Certifications

Plaintiffs cite Catalano's and Taylor's certifications under Sarbanes-Oxley, that the Company's internal controls systems are "designed . . . to provide reasonable assurance regarding reliability of financial reporting." (Docket Entry No. 60, Amended Complaint at ¶¶ 176-78) (emphasis added). ASG cites its Form 10-Ks for both 2004 and 2005 disclosing that its internal controls were subject to "inherent limitations" and "may not prevent or detect misstatements."

82

(Docket Entry No. 70, Appendix 2 at p. 30; Appendix 1 at p. 37). In <u>Garfield</u>, the Sixth Circuit stated "If we were to accept [Plaintiffs'] proffered interpretation of Sarbanes-Oxley, scienter would be established in every case where there was an accounting error or auditing mistake made by a publicly traded company, thereby eviscerating the pleading requirements for scienter set forth in the PSLRA." 466 F.3d at 1266.

As stated earlier, under <u>Bridgestone</u>, the Court must also consider these certifications in light of the other circumstances alleged by the Plaintiffs. To be sure, a court "should not presume recklessness or intentional misconduct from a parent corporation's reliance on its subsidiary's internal controls." <u>In re Comshare</u>, 183 F.3d at 554. Where "Plaintiffs have failed to plead facts that show that revenue recognition errors at [a subsidiary] should have been obvious to [the parent company] or that [the parent company] consciously disregarded 'red flags' that would have revealed the errors prior to their inclusion in public statements, . . .the Complaint fails to allege facts that give rise to a strong inference of scienter under §10(b) and Rule 10b-5" <u>Id.</u> at 553, 554; <u>see also Ley</u>, 543 F.3d at 812.

For the reasons stated earlier, the Court concludes that Plaintiffs allege specific facts about ASG's consolidated financial statements and SPP's and PHS's practices as to controlling ASG's costs. ASG is a small, close-knit corporate family where executive officers met and shared detailed information about SPP's and PHS's actual costs and practices or were informed about these practices by other corporate employees before their public disclosure. Based upon the collective circumstances of Catalano's and Taylor's certifications of their personal involvement in ASG's and its subsidiaries' internal cost controls, Catalano's statement of ASG's management's "intense focus" on ASG's subsidiaries' costs, ASG's meetings and extensive corporate knowledge of SPP's and PHS's practices, and the internal reports to Catalano by PHS's officers of PHS's

83

unlawful practices, the Court concludes the Plaintiffs' allegations give rise to strong inferences of scienter. These factual allegations, collectively, establish the red flags to create a strong inference of the Defendants' scienter, whether intentional or reckless.

## ASG's GAAP Violations

As to Plaintiffs' claims for the Defendants' alleged violations of GAAP standards in ASG's reporting of its financial condition, Plaintiffs contend that essence of "cookie jar" accounting is to "smooth" a company's earnings by under-reporting revenues in "fat" quarters so they can be held over and reported in "lean" quarters. (Docket Entry No. 60, Amended Complaint at ¶¶ 85-86).

ASG allegedly admitted that "key members of SPP's senior management inappropriately established and used certain reserves during various periods over the last five years to more closely match SPP's reported earnings to its budgeted results." Id. at ¶¶ 75-76, 87,145, 222, . This practice, commonly referred to as "cookie jar" accounting, allegedly demonstrates the Defendants' deliberate effort to manipulate improperly SPP's accounting to achieve desired results. Id. at ¶ 277.

As to ASG's revenue and cost recognition policy, ASG's March 28, 2002 SEC 10-K Report stated, in pertinent part:

Revenue and Cost Recognition

The Company's contracts with correctional institutions are principally fixed price contracts adjusted for census fluctuations. Revenues earned under contracts with correctional institutions are recognized in the period that services are rendered. **Cash received in advance for future services is recorded as deferred revenue and recognized as income when the service is performed.** Healthcare expenses include the compensation of physicians, nurses and other healthcare professionals including any related benefits and all other direct costs of providing the managed care. **The cost of healthcare services provided or contracted for are recognized in the period in which they are provided based in part on estimates, including**

84

**an accrual for unbilled medical services rendered through the balance sheet dates.** The Company estimates these medical claims reserve using an actuarial analysis prepared by an independent actuary taking into account historical claims experience (including the average historical costs and billing lag time for such services) and other actuarial data.

Id. at ¶ 113.

In addition, Plaintiffs cite the lack of internal controls at SPP that caused SPP's clients not to receive credits due under their contracts. Plaintiffs allege that ASG admitted its lack of internal controls in its restatement:

> [T]he lack of adequate "internal control procedures necessary to reasonably detect material errors in revenues, expenses, accounts receivable, inventory, and accrued expenses, or to assure that SPP's customers were being charged in compliance with the terms of their contracts. Among the internal controls that were lacking during the Class Period were procedures necessary to ensure that contractual pricing terms were allowed when customers were billed, returns were properly credited to customer accounts, and ASG[]'s finance department reviewed SPP's monthly accounting reconciliations to prevent improper use of accruals and reserves and other accounting gimmicks used to manage or inflate reported results. See ASG[]'s FY05 Report on Form 10-K, Item 9A. **For example, as recounted by numerous former employees of SPP, ASG[] and its management knew that the Company had recurrent problems with maintaining accuracy in financial reporting due to its use of computer systems that were unable to properly manage sales and expense dates. CIPCS, SPP's system in place at the start of the Class Period, or earlier, repeatedly caused lost or delayed prescription orders, and was unable to track and apply contract-specific pricing terms. CIPCS' replacement, called SPIN, was plagued with similar problems from the time it was improperly launched in June 2005. See infra §VII.C.**
>
> **In this 2005 Form 10-K ASG[] admitted that the Company's internal controls "were not designed or operating effectively to reduce to remote the likelihood that material errors [in ASG[]'s consolidated financial statements] would be prevented or detected in a timely manner."**

Id. at ¶¶ 78 and 79 (emphasis added).

Plaintiffs set forth a series of financial statements and cite GAAP rules and bulletins to reflect their contentions that ASG's restatement of its finances for 2000, 2001, 2003, 2004 and 2005 violated GAAP standards. Id. at ¶ 234-237, 241, 243, and ¶¶ 248, 278 and 292. Plaintiffs

85

add that after the restatement, ASG failed to amend its 14 Form 10-K reports that contained the same information that needed to be revised on other documents. Id. at ¶ 243. ASG's report on its 2005 fiscal year 10-K, reflects that ASG reclassified revenues as "discontinued operations." Id. at ¶¶ 246-247.

Based on these GAAP violations, Plaintiffs allege that these "reclassifications" are adjustments with adverse tax consequences. Id. at ¶ 246. Specifically, Plaintiffs challenge ASG's reclassification of contracts as improper under GAAP.

> ASG claimed that the "reclassification" of revenues was required by FASB Statement of Financial Accounting Standards ("SFAS") No. 144 to reflect revenues from contracts that had been cancelled or would not be renewed as resulting from discontinued operations. Because, however, ASG had *already* applied SFAS No. 144 at the time its financial statements were originally issued, no such change was required or permitted by SFAS No. 144. Nor did Accounting Principles Board ("APB") Opinion No. 20, which governs ASG's restatement, permit ASG to retroactively reclassify the revenues in its past financial statements, absent recognition that those revenues were false at the time they were originally reported.

Id. at ¶ 250.

Plaintiffs contend that the Defendants' accounting errors were not minor because ASG's restatement here impacted five years of ASG's financial results, resulting in changes to virtually every line item and metric important to investors, including its revenues, expenses, cost margins, EBITDA (Earnings Before Interest, Taxes, Depreciation, and Amortization), inventory, accounts receivable, accrued expenses and reserves. Plaintiffs allege ASG overstated its income for continuing operations by $18 million and understated its income from discontinued operations by $14 million. Id. at ¶ 248. For these collective practices, Plaintiffs allege that "[a]s a result of these accounting manipulations, ASG's reported revenues, healthcare expenses, SG&A expenses, gross margins, medical expense margins, total cost margins, EBITDA, net income, EPS, inventory, A/R, and accrued expenses were materially false and misleading to investors. Id. at ¶ 268

86

In this Circuit, "[t]he failure to follow GAAP is, by itself, insufficient to state a securities fraud claim." In re Comshare, 183 F.3d at 553 (citations omitted). To give rise to an inference of scienter, accounting violations must be of a "type and scope" to be "obvious" or to show the "'magnitude' 'pervasiveness' and 'repetitiveness' of the company's violations of 'simpl[e] accounting principles' amounting to a night-and-day difference.'" PR Diamonds, 364 F.3d at 684, 685 (quoting In re MicroStrategy, Inc.Securities Litig., 115 F. Supp. 2d 620, 636, 637 (E.D. Va. 2000). For accounting errors to suffice, the Plaintiffs must also allege facts "that Defendants knew or could have known of the errors or that regular procedures should have alerted them to the errors sooner than they actually did." In re Comshare, 183 F.3d at 553. Yet, accounting errors can be "viewed in combination with other allegations." Id.

The accounting errors at SPP were structural in that SPP's computer system lacked the programming capability to calculate correctly and reflect the amounts owed to clients in rebates or discounts from SPP's sellers or from returned medications. As to the effect of SPP's customer billing errors and other accounting irregularities, ASG notes that SPP contributed less than 6% to its aggregate revenues during the alleged Class Period. (Docket Entry No. 60, Amended Complaint ¶¶ 5, 222, 225, 228). Yet, SPP was identified as a key source of ASG's future growth. Id. at ¶ 161. ASG restated previously filed financial statements for the years ended December 31, 2001 through December 31, 2004 and for the first six months of 2005. ASG's restatement reduced prior reported net income for these periods by $2.1 million in the aggregate, as reflected in the Effects of Restatement schedule, and reduced previously reported retained earnings as of January 1, 2001 by $347,000. Plaintiffs also allege that Defendants made additional corrective disclosures on October 24, 2005 (announcement of internal investigation) and March 16, 2006 (announcement of results of investigation: restatement of earnings), which caused material drops,

87

28.1% and 28.8%, in ASG's stock price, respectively. Id. at ¶¶ 300, 304-305.

Plaintiffs allege that Catalano, Taylor, Hartman and Bryson closely monitored ASG's reported margins and medical expenses, particularly the pharmacy, staffing and off-site utilization costs that caused ASG's 2001 losses and are the core of the underreported expenses during the Class Period. ¶¶ 328-333. Plaintiffs allege that through regular meetings and systematic reports detailing performance at each prison where ASG operates, ASG's key officials knew of the expense trends and other business practices at PHS and SPP. Id. at ¶ 26, 308-316. ASG publicly touted its customized computer systems that permit ASG executives to monitor revenue and expense continually across the country. Id. at ¶¶ 26, 309.

Despite contentions that ASG maintained a control environment that complied with the Treadway COSO standard, one of the strictest and highest standards of internal control, ASG admitted to numerous, and basic structural deficiencies in its internal control systems during the Class Period, including the lack of procedures to assure that: (i) contract pricing rules be placed in SPP's accounting systems; (ii) changes to customer pricing rules be documented; and (iii) written policies to define pricing and return policies. Id. at ¶¶ 183, 287-289.

In combination with the Defendants' other alleged statements, nondisclosures and corporate practices, the Court concludes that Plaintiffs' allegations of systemic accounting violations add to the strong inference of the Defendants' scienter.

### Motive and Opportunity Allegations

With the analyses of the various statements, nondisclosures and unlawful business practices, the Court now addresses Plaintiffs allegations of the Defendants' "motive and opportunity" that Plaintiffs assert also give rise to a "strong inference" of scienter. As to the motive, Plaintiffs cites the Defendants' reaction to negative business conditions in the second

88

quarter of 2001, when SPP's drug and PHS's off-site utilization expenses caused ASG's healthcare margins to reach 99.7% of revenues, and reduced its stock value from $18.94 to $8.04 per share. (Docket Entry No. 60, Complaint at ¶¶ 4, 33-37). Plaintiffs' theory is that Defendants' concealed SPP's improper accounting actions that artificially reduced SPP's costs below contractually required levels to address ASG's 2001 results. Id. at ¶¶ 42-82, 308-316. Plaintiffs assert that these two key circumstances demonstrate the Defendants' motivation to falsify information to assure investors that ASG had remedied its past cost containment problems.

Financial pressures may provide the motive. PR Diamonds, 364 F.3d at 688; In re Cardinal Health Sec. Litig., 426 F . Supp. 2d 688, 726-27 (S.D. Ohio 2006). "[S]elf-interested motivation of defendants in the form of saving their salaries" can supports scienter. Bridgestone, 399 F.3d at 687. "A very difficult position" and "unusual pressures to perform," coupled with other factors, can provide motive. Telxon, 133 F. Supp. 2d at 1029. Plaintiffs' allegations are that the individual Defendants' motives were also to secure promotions and to enhance their compensation. In this Circuit "an executive's desire to protect his position within a company or increase his compensation" does not "comprise a motive for fraud." PR Diamonds, 364 F.3d at 690, nor are allegations that Defendants would receive bonuses linked to company performance sufficient. In re Kindred Healthcare, 299 F.Supp.2d at 741.

The Court concludes that collectively, Plaintiffs' factual allegations give rise to a strong inference of scienter from the Defendants' motive and opportunity to engage in these practices. With the results of 2001, ASG's gross margin had a 99.7 % level of costs, SPP lost 18.5% in revenue, and ASG's chief financial officer was terminated. Plaintiffs assert that these circumstances demonstrate the Defendants' motivation to falsify information to assure investors that ASG had controlled its past cost containment problems and to remain a financially viable

89

company in which to invest. Plaintiffs allege the Defendants' responses to these conditions were to institute **systemic** business practices at PHS that refused to provide contractually required medical services to inmates, understaffed its medical operations, prisons, and failed to credit the government for required rebates, discounts and product returns at SPP.[9] Id. at ¶¶ 5-6,42-72. These alleged practices had a direct positive effect on ASG's operating margins that investors utilize to analyze ASG's performance. Id. at ¶¶ 32-41, 88-91, 281-283. When these practices were instituted without effective or any meaningful internal controls, ASG experienced a reversal of ASG's earnings and a significant rise in the value of ASG's stock during the Class Period. Id. at ¶¶ 88-91. Without reasonably effective cost controls or accounting review, the factual information in ASG's reports on its financial condition were admittedly serious, inaccurate and misleading.

To undermine the inference of scienter, ASG cites its repurchase of some $3 million worth of shares of its own stock in furtherance of a $30 million stock repurchase program between the July 26, 2005 announcement of the program and suspension of the program in fall 2005 during the pendency of the Audit Committee investigation. To be sure, "[a] company's decision to reinvest its own stock undermines an inference of scienter because it presumably would make no sense to purchase that stock if defendants knew the prices to be inflated." Morse, 200 F. Supp. 2d at 898 (internal quotation marks omitted). There are ambiguous inferences for these Defendants' purchases of ASG stock. Yet this repurchase decision occurred after publication of the New York Times articles in February and March, 2005 and in that context, this repurchase program does not gives rise to a favorable inference.

---

[9] Plaintiffs allege defendants' fraud began prior to the class period. Id. at ¶¶ 111-127.

Case 3:06-cv-00323   Document 99   Filed 03/31/09   Page 92 of 102 PageID #: 2505

As to Plaintiffs' allegations about the firing of Hartman and Bryson, the adoption of sweeping internal Reforms, and the resignation of members of ASG's Audit Committee, some courts do describe these events as unusual. As one court recognized in similar circumstances:

> This was strong medicine. Such house-cleaning and reforms do not follow innocent mistakes. Rather, they customarily, even if not invariably, follow systemic and fraudulent abuse of internal financial controls. These circumstances, combined with the announcement of the impending restatement, establish a strong inference that the company itself believes that fraud led to materially misleading financials for the period in question. . . .

In re Sipex Corp. Sec. Litig., 2005 WL 3096178, at *1 (N.D. Cal. Nov. 17, 2005).

In closing, Plaintiffs rely on former ASG executives for their allegations on the origin, nature and cause of ASG's and SPP's false accounting practices. With specific factual allegations, and Plaintiffs' anonymous sources are not altogether irrelevant to the scienter analysis. Ley, 543 F.3d at 811. A complaint may rely upon persons with personal knowledge of relevant events, including a defendant's public statements or admissions, or public documents for its allegations of specific facts on a company's internal operations. Novak v. Kasaks, 216 F.3d 300, 313-14 (2d Cir. 2000). Plaintiffs note that the naming of such sources is not required. Id. For example, statements of former vice presidents are permissible to describe the information they personally related to Catalano about problems at sites where they were personally responsible for overseeing operations. (Docket Entry No. 60, Amended Complaint at ¶¶ 51-52). Hearsay is a sufficient basis on which to allege such facts in a complaint. In re Air Disaster at Lockerbie Scotland on Dec. 21, 1988, 144 F.R.D. 613, 617 (E.D.N.Y. 1992).

In sum, the Court concludes that collectively, Plaintiffs' factual allegations are sufficiently specific to give rise to a strong inference of recklessness in the Defendants' actionable misrepresentations, omissions and unlawful business practices as set forth above.

91

### 5. Plaintiffs' Section 20(a) Claims

Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t, Section 15 of the 1933 Act, and Section 20(a) of the 1934 Act impose legal responsibilities upon the "controlling person" in a publicly traded company for violations of the Securities Act by their agents, subject to certain defenses. Section 15 of the 1933 Act provides as follows:

> Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77o. Similarly, Section 20(a) of the 1934 Act provides:

> a. Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such control person is liable unless the controlling person acted in good faith and did not directly or indirectly induce the acts constituting the violation or cause of action

Under federal securities law, the controlling person must be an actual participant and in control of the specific activity at issue. Sanders Confectionery Prods. v. Heller Fin., Inc., 973 F.2d 474, 486 (6th Cir. 1992). "[E]ssential elements" for a control person is of "power to control the specific transaction or activity upon which the primary violation is predicated" **and** "actual participation (i.e., exercise control) in the operations of the primary violator in general." (emphasis added). "Because 'controlling person' liability is derivative, however, a plaintiff may hold a defendant liable under this theory only if the defendant controlled an entity that violated the

92

Securities Act." D.E. & J. Limited P'ship v . Conaway, 133 Fed. Appx 994, 1001 (6th Cir. 2005).

Accord In re Prison Realty Secs. Litig., 117 F. Supp. 2d 681, 692 (M.D. Tenn. 2000); Azzolini v.

Corts Trust II for Provident Financial Trust I, 2005 WL 2253971, at *13 (E.D. Tenn. Sept. 16,

2005). PSLRA's strong inference requirement does not apply on this claim. See Florida State Bd.

of Administration v. Green Tree Financial Corp., 270 F.3d 645, 660 (8th Cir. 2001). "Allegations

of control are not averments of fraud and therefore need not be pleaded with particularity." In re

Nat'l Century Fin. Enters., Case No. 2:03-md-1565, 2006 WL 469468, at *23 (S.D. Ohio Feb. 27,

2006).

In In re Telxon Corp. Sec. Litig., 133 F. Supp. 2d 1010 (N.D. Ohio 2000), that court

explained as to corporate officials:

> [T]itles and functions alone do not establish "controlling person" status. There
> must be some showing of actual participation in the corporation's operation or
> some influence before the consequences of control may be imposed. Further, there
> must be some showing of actual participation in the activities which allegedly
> violated the securities laws.

Id. at 1032. See also Bomarko, Inc. v. Hemodynamics, Inc., 848 F. Supp. 1335, 1339 (W.D.

Mich. 1993).

As applied here, Plaintiffs have sufficiently alleged that ASG controls SPP and PHS as the

sole owner of PHS and SPP. SPP controlled its own financial statements, that were incorporated

into ASG's consolidated financial statements, and to that extent SPP controlled SG. ASG had

direct control over SPP as reflected in its firings of the individual defendants Hartman and

Bryson. In these circumstances, control is presumed as to Defendants ASG and SPP. See In re

Advanced Lighting Techs., Inc., Case No. 1:99 CV 0836, 2000 U.S. Dist. LEXIS 20628, at *22-

23 (N.D. Ohio June 6, 2000) (section 20(a) sufficiently pled).

ASG publicly touted its customized computer systems that permit ASG executives to

93

monitor revenue and expense continually across the country.  Id. at ¶¶ 26, 309.  PR Diamonds

cited approvingly of precedent that found a strong inference arising where the company "touted

the individual Defendants' careful monitoring of the very areas in which Intrenet committed

accounting violations."  364 F.3d at 688 (citation omitted).

As to the individual Defendants' liability as controlling persons, "high-level executives

can be presumed to be aware of matters central to their business's operation.  PR Diamonds, 364

F.3d at 688.  "Courts may presume that high-level executives are aware of matters related to their

business' operation where the misrepresentations as omissions pertain to 'central, day-to-day

operational matters.'"  Cardinal Health, 426 F. Supp. 2d at 724.  This is particularly appropriate

for "[f]acts critical to a business's core management."  In re Ancor Commc'ns, 22 F. Supp. 2d 999,

1005 (D. Minn. 1998).  A company's chief executive officer who regularly participates in

meetings, signs SEC filings and participates in earnings announcements can be sufficiently

involved so as to raise strong inference of scienter.  In re Envoy Corp. Sec. Litig., 133 F. Supp. 2d

647, 663-64 (M.D. Tenn. 2001).  In Envoy, the Honorable Todd J. Campbell, Chief Judge held

that plaintiffs' § 20(a) claims were sufficiently pled against that corporate defendant's top officers

"because of their respective positions in the company, were each involved in the day-to-day

management of [Defendant Company] . . .and . . . controlled and/or possessed the authority to

control the contents of [Defendant Company]'s reports, press releases and presentations to the

public and, through that power, fraudulently misled the investing public."  Id. at 762.

Plaintiffs' specific allegations are that Catalano, Taylor, Hartman and Bryson who were at

the highest levels of ASG's, SPP's and PHS's management, initiated, concealed and maintained

the above described practices. Catalano and Taylor were ASG's  primary spokespersons to

investors and analysts and personally directed the conference calls, public press releases and other

94

disclosures on ASG's finances and the financial performance of ASG's subsidiaries. Taylor was

ASG's chief financial officer who, according to ASG's website, was responsible for "direct[ing]

the Company's SEC] reporting," "corporate accounting," "PHS site accounting," "operational

analysis," "budgeting," and "investor relations." Id. at ¶ 21. Plaintiffs allege specific practices,

meetings, and procedures from persons with detailed contemporaneous knowledge of Catalano's

and Taylor's personal involvement in these corporate cost control practices and decisions

involving ASG, SPP and PHS. Id. at ¶¶ 26, 308-316.

In their Sarbanes-Oxley certifications, Defendants Catalano and Taylor stated their shared

responsibility to ensure adequate controls at ASG. In these certifications, Catalano and Taylor

certified that their personal responsibilities on these control measures included ASG's

"consolidated subsidiaries." Id. at 60. Every quarter, Catalano and Taylor specifically certified

that they had each personally reviewed the controls at ASG "including its consolidated

subsidiaries" during the past 90 days, and found them to be both reasonably adequate. Id. at ¶¶

176-178. Here, ASG Catalano, chief executive officer and Taylor, chief financial officer,

specifically undertook responsibility for designing, maintaining, and certifying the adequacy of the

internal controls at PHS that shares offices with ASG and SPP that is nine miles away. Id. at ¶¶

18, 175-178. Under SEC rules, these responsibilities include:

> Disclosure controls and procedures [would] include, without limitation, controls
> and procedures designed to ensure that information required to be disclosed by an
> issuer in the reports that it files or submits under the Act is accumulated and
> communicated to the issuer's management, **including its principal executive and
> principal financial officers**, or persons performing similar functions, as
> appropriate to allow timely decisions regarding required disclosure.

SEC Rule 13a-15(e), 17 C.F.R. 5240.13a-15(e); SEC Rule 15d-15(e), 17 C.F.R. 5240.1 5d-15(e).

(emphasis added).

The Court concludes that Catalano and Taylor are controlling persons as to ASG, SPP and PHG. From a management perspective, ASG, SPP and PHS are small companies with at least one interlocking officer, Hartman, who was SPP's chief executive officer, PHS's chief executive officer and ASG's executive vice-president.

Plaintiffs' allegations are that with Catalano and Taylor, Hartman and Bryson closely monitored ASG's reported margins and medical expenses, particularly the pharmacy, staffing and off-site utilization costs , including for particular PHS sites. Hartman and Bryson were chief executive officers at SPP where accounting errors based upon SPP's defective computer program for pricing and SPP's manual were widespread. Governmental inquiries revealed that PHS's activities were a product of corporate management to reduce PHS's costs. ASG told investors on March 15, 2006 that the "key managers" responsible were no longer with ASG that can reasonably be inferred as meaning Hartman and Bryson, who were fired in December 2005. ASG's restatement described these practices as dated to the time ASG acquired SPP when Hartman and Bryson were in charge. E.g., ¶¶ 54, 240; see also ¶¶ 27-28.

In these collective circumstances, with all favorable inferences to the Plaintiffs, as required for this type of motion, Plaintiffs have properly alleged that Catalano and Taylor closely monitored ASG's reported margins and medical expenses, and Hartman and Bryson managed SPP's pharmacy costs and PHS's staffing and off-site utilization costs that caused ASG's 2001 losses. For these reasons, the Court concludes that Catalano, Taylor, Hartman and Bryson are controlling persons of ASG, PHS and/or SPP.

### 6. Dura's Injury Requirement

Defendants challenge Plaintiffs' contention that they are entitled to recover "losses" resulting from declines in the price of ASG's shares following earnings announcements in October

96

2004 and February 2005, even though neither of these announcements revealed to the market any of the alleged fraudulent practices at PHS and SPP. (Docket Entry No. 60, Amended Complaint at ¶¶ 300-02). Defendants characterize these announcements as disappointing news of ASG's margins and earnings. Defendants contend that because these disclosures did not reveal the alleged fraud to the market, Plaintiffs have not suffered any actionable losses, citing Initial Pub. Offering, 399 F. Supp. 2d 261, 266 (S.D.N.Y. 2003) ("[A] failure to meet earnings forecasts has a negative effect on stock prices, but not a corrective effect. . . . It does not disclose the scheme; therefore it cannot correct the artificial inflation caused by the scheme.") and In re Compuware See. Litig., 386 F. Supp. 2d 913, 919 (E.D. Mich. 2005) (allegations linking drops in stock price to disclosures of financial news that do not reveal fraud are insufficient to establish loss causation).

Yet, Plaintiffs also allege that despite the February 2005 announcement, the alleged fraudulent practices at PHS and SPP remained concealed from investors. Id. ¶ 302. Plaintiffs allege that Defendants' false statements and earnings disclosures on specific dates caused the artificial increase in ASG's stock price and sets forth the amount of that inflation. Id. at ¶ 298. Plaintiffs compare ASG's stock price with broader market indices and an industry peer group to allege that ASG's stock price increases were attributable to Defendants' false representations, rather than industry or market-wide factors. Id. at 298.

Plaintiffs' complaint also alleges that public disclosures of the Defendants' conduct at PHS also caused ASG's stock price to decline. Id. at ¶¶ 9, 88, 92-94, 223, 293-306. Plaintiffs cite negative earnings announcements after February 27,2005, the date of the first New York Times article which plaintiffs allege began to reveal conditions concealed by defendants' fraud scheme and to cause ASG's stock price to drop by 8.3% and 9.7%, respectively. Id. at ¶¶ 300-302.

97

The Reform Act provides that "the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this [chapter] caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). Fed. R. Civ. P. 8(a)(2) requires that Plaintiff plead "the relevant economic loss." Moreover, Plaintiffs' complaint must provide some basis for a causal connection between plaintiffs' loss and defendants' misconduct. Dura Pharms. v. Broudo, 544 U.S. 336, 347 (2005). In Dura, the Supreme Court noted that the pleading requirements for loss causation "are not meant to impose a great burden upon a plaintiff," id. at 347, but a plaintiff must allege "a causal connection between the material misrepresentation and the loss." Id. at 342. The securities plaintiff must allege that the misrepresentations or concealment "made its way into the market" or became "generally known" to the market and thereby caused a company's stock price to decline. See Lenten v. Merrill Lynch & Co., 396 F.3d 161, 173 (2d Cir. 2005) (plaintiffs must allege that the purported misstatements or omissions "concealed something from the market that, when disclosed, negatively affected the value of the security").

The Court concludes that Plaintiffs' allegations are sufficient for such causation under Fed. R. Civ. P. 8 and Dura, with the decline of ASG's stock after the *New York Times* article on PHG's practices. Moreover, with Plaintiffs' fraud on the market theory, Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, Plaintiffs paid artificially inflated prices for ASG's publicly traded securities. See D.E. & J. LL.P'ship v. Conaway, 133 Fed. Appx. 994, 999, 1001 (6th Cir. 2005). In Conaway, the plaintiff did not attempt to allege any "causal connection" between the stock price drops and defendants' earlier misstatements but instead sought to establish loss causation on allegations of price inflation alone. Id. at 999-1000. See also Semerenko v. Cendant Corp., 223 F.3d 165, 186-87 (3d Cir. 2000) ("So long as the

98

alleged misrepresentations were a substantial cause of the inflation in the price of a security and in its subsequent decline in value, other contributing forces will not bar recovery.").

As to the Defendants' contention of alternate causes of Plaintiffs' losses, the Court agrees with the Seventh Circuit that "it is possible for more than one cause to affect the price of a security and, should the case survive to that point, a trier of fact can determine the damages attributable to the fraudulent conduct." Caremark, Inc. v. Coram Healthcare Corp., 113 F.3d 645, 649 (7th Cir. 1997)

As to the Defendants' reliance on In re Compuware Sec. Litig., 386 F. Supp. 2d 913 (E.D. Mich. 2005), there it was "undisputed" that the lead plaintiffs sold all of their stock "well before" any corrective disclosure or stock price decline. Here, Plaintiffs did not sell their stock prior to the partial corrective disclosures which revealed the fraud to the market and caused ASG's stock price to decline. Further, in In re Compuware, the plaintiffs did not "allege that a price decline immediately accompanied the . . . disclosure [of fraud], leaving th[at] court to speculate what portion of the loss, if any, should be attributed to the disclosure or whether the loss was caused by other factors." Id. at 919. Plaintiffs here have made numerous references in their Amended Complaint that reflect the timing of the loss causation, particularly with regards to the timing of the fraud, the dates on which it was slowly revealed to the market, and the accompanying effect on ASG's stock price. (Docket Entry No. 60, Amended Complaint at ¶¶ 4-7, 16, 41, 44, 293-306.

99

## C. Relief

For the above stated reasons, the Court concludes that the Plaintiffs have alleged sufficient specific facts that collectively state actionable claims under Section 10(b) and Rule 10b-5. Accordingly, the Defendants' motion to dismiss should be denied.

An appropriate Order is filed herewith.

Entered this the _30th_ day of March, 2009

William J. Haynes, Jr.
United States District Judge

100